[No. D051983. Fourth Dist., Div. One. Feb. 24, 2009.]

PAULA J. BROWN et al., Plaintiffs and Appellants, v.
ROBERT RANSWEILER, Defendant and Respondent.

**COUNSEL**

Alvin M. Gomez for Plaintiffs and Appellants.

Daley & Heft, Lee H. Roistacher and Robert W. Brockman for Defendant and Respondent.

John J. Sansone, County Counsel, and Nathan C. Northup, Chief Deputy County Counsel, for The League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendant and Respondent.

**OPINION**

**AARON, J.—**

## I.

## INTRODUCTION

Paula J. Brown, an innocent bystander, was injured by fragments from at least one stray bullet fired by a police officer. At the time shots were fired, law enforcement officers were attempting to apprehend a murder suspect who had just driven up onto the curb at a strip mall, heading in the direction of two police officers. Several officers fired at the suspect, believing that the life of at least one of the officers was in imminent danger. Paula and her son, Jonathan Brown,[1] who was with Paula when she was shot, sued a number of the officers who were on the scene, including respondent El Cajon Police Officer Robert Ransweiler. We conclude that under the undisputed facts presented on summary judgment, Ransweiler's shooting at the suspect was objectively reasonable as a matter of law, and that he therefore cannot be held liable for the Browns' injuries.

---

[1] When appropriate, we will refer to appellants by their first names to avoid confusion.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Factual background*

#### 1. *The Browns' experience*

On August 5, 2004, Paula and Jonathan were in the lobby of their dentist's office, which was located in a strip mall in Spring Valley. In addition to the dental office, the strip mall housed a Subway restaurant, a plumbing store, and a charter school, all of which were open for business at the time of the incident. Jonathan heard shots being fired, and then heard his mother yell that she had been hit. Glass from a broken window was flying through the lobby of the dental office. Jonathan turned his back to the window and grabbed his mother. At least one bullet went through Paula's breasts. It is possible that Paula was hit by more than one bullet.

#### 2. *The VCTF and the shooting of Jorge Ojeda*

On August 5, 2004, members of the Violent Crimes Task Force (VCTF) were conducting surveillance on Thomas Miller, a suspected drug dealer, because they believed that Miller was going to meet with Jorge Ojeda, who was a suspect in a murder investigation. The VCTF is a multiagency task force, of which officers Sean Torphy, Fred James, and Stephen Kinkaide were members.

After learning that Miller was a "person of interest" to the El Cajon Police Department, San Diego Police Department Detective and VCTF leader, Tim Faubel, informed Ransweiler that the VCTF was going to be watching Miller, and asked Ransweiler to assist in the surveillance. Faubel informed Ransweiler that Miller was at a Spring Valley strip mall.

Ransweiler and Ransweiler's partner, Officer Christopher Baldwin, proceeded to the strip mall to assist in the surveillance effort. Ransweiler and Baldwin were not members of the VCTF.[2] After Ransweiler and Baldwin arrived at the strip mall, they conducted surveillance of Miller from their vehicle. Faubel and other VCTF members were also at the strip mall, watching Miller.

A man driving a Jeep pulled into the strip mall parking lot and parked next to Miller. Over the police radio, a member of the VCTF identified the man

---

[2] The VCTF did not include any members of the El Cajon Police Department.

driving the Jeep as Ojeda. Ojeda got out of his Jeep and began talking with Miller. Ojeda spoke with Miller for 10 to 15 minutes.

Faubel contacted the San Diego Police Department and requested additional assistance in arresting Ojeda. Faubel devised a tactical plan to apprehend Ojeda. He ordered "all units" to move in to arrest Ojeda once Ojeda got back into his parked vehicle. Faubel planned to have marked police cars "come in behind the Jeep to block Ojeda's potential escape."

Once Ojeda returned to the Jeep, Faubel ordered all personnel, which included Ransweiler and Baldwin, to converge on Ojeda and arrest him. VCTF members in marked police cars used their vehicles to block Ojeda's Jeep from behind. Other VCTF members, as well as Ransweiler and Baldwin, ran toward Ojeda and ordered him to get out of his vehicle. Ransweiler and Baldwin approached Ojeda from the east on the covered sidewalk that abutted the strip mall. All of the officers were wearing raid gear as they approached Ojeda.

Ojeda refused to turn off the ignition to his vehicle or get out of the vehicle. Instead, he drove the Jeep up over the curb and onto the sidewalk. Ojeda then "gunned" the engine, turned right, and drove on the sidewalk, toward Ransweiler and Baldwin. Ojeda began to drive at a high rate of speed directly at Ransweiler and Baldwin. As Ojeda accelerated toward the two officers, Ransweiler dove to his left, between two parked cars. Baldwin could not make a similar move to get out of the way of the oncoming vehicle due to his position in relation to the parked cars.

As the Jeep was coming straight at him, Baldwin shot his gun in the direction of the Jeep, aiming for the windshield of the vehicle. Baldwin's gunshots hit the Jeep's windshield. After Baldwin fired at the Jeep, the Jeep veered to the right and struck Paula's late-model SUV, which was parked in the parking lot. As Baldwin was backing up in an effort to get away from the Jeep, he tripped and fell to the ground.[3] A number of other officers saw Baldwin fall, and feared that Ojeda was about to run him over. Officers Ransweiler, Kinkaide, James, and Torphy all fired rounds at Ojeda. Ransweiler and Baldwin were using .40-caliber handguns, while Kinkaide, James, and Torphy were using nine-millimeter handguns.

At some point Ransweiler had moved from his position between the two parked cars. He was between Ojeda's Jeep and the storefronts of the strip mall, facing away from the dental office and toward the driver's side door of

---

[3] It is unclear whether Baldwin remained on the ground after he fell, or whether he rolled and stood up.

Ojeda's vehicle, when he fired at Ojeda.[4] Ransweiler was approximately three feet from Ojeda when he fired at Ojeda. Ojeda was struck by several rounds fired by Ransweiler, and was pronounced dead at the scene.

Police officers fired a total of 33 or 34 rounds that day. Officer Ransweiler fired five shots, Officer Baldwin fired 14 shots, Officer Kinkaide fired five shots, Officer James fired five, and possibly six, shots, and Officer Torphy fired four shots. Criminalist Lance Martini determined, to a reasonable degree of scientific probability, that Paula was hit by a "projectile core" discharged from Officer Baldwin's firearm. Paula's injuries were consistent with being struck by a fragment or ricochet, not by a stabilized projectile (a bullet). Martini could not rule out the possibility that Paula had been struck by multiple bullet fragments, and could not say to a reasonable degree of scientific certainty that Paula was not struck by a bullet fragment fired from a nine-millimeter weapon.

## B. *Procedural background*

On July 11, 2006, Paula and Jonathan filed this action against Baldwin, Ransweiler, and other officers,[5] alleging causes of action for negligence and for assault and battery.[6]

After answering the complaint, Baldwin and Ransweiler filed a joint motion for summary judgment, or, in the alternative, summary adjudication. The officers argued that they could not be found liable for their conduct in the performance of their police duties, and that their conduct was not negligent, as a matter of law. The officers further argued that they could not be liable for assault and/or battery because their shooting of Ojeda was justifiable homicide, and they were therefore immune from any civil liability arising from the shooting.

Paula and Jonathan filed an opposition to the officers' motion for summary judgment on July 26, 2007.

---

[4] As we discuss in part III.B.1., *post*, the Browns suggest that this fact, among others, is in dispute. However, the evidence the Browns cite as placing this fact, as well as other facts, in dispute, does not actually establish the existence of any dispute as to Ransweiler's location when he shot at Ojeda.

[5] For reasons not apparent in the record, Paula and Jonathan dismissed the other named defendants while continuing to pursue the action against Baldwin and Ransweiler.

[6] The complaint alleges a cause of action for assault and battery only as to Paula. However, for ease of discussion, we will generally refer to the causes of action as being brought by the Browns, jointly. Further, although the complaint is styled as having only two causes of action, one for negligence and one for "assault and battery," the claims of "assault" and of "battery" are conceptually distinct causes of action. However, because the Browns have never distinguished between an alleged "assault" and an alleged "battery," and instead chose to prosecute the claim as one for a battery, we will similarly address Paula's second cause of action as alleging a cause of action for battery.

The trial court heard oral argument on the matter on August 10, 2007. The court sustained the officers' objections to all of the Browns' expert's references to the El Cajon Police Department policies and procedures,[7] and granted Ransweiler's motion for summary judgment in full.[8] The trial court entered judgment in favor of Ransweiler. The Browns filed a timely appeal.[9]

## III.

## DISCUSSION

The Browns challenge the trial court's grant of summary judgment of their negligence and battery claims in favor of Ransweiler.

In granting Ransweiler's motion for summary judgment, the trial court made the following observations and reached the following conclusions with regard to the negligence cause of action: "The Court recognizes that pre-shooting tactical decisions of the officers not to approach Ojeda until after he returned to his Jeep is not a proper basis for negligence. [Citation.] Accordingly, the question before this court is whether or not a triable issue of fact exists as to if officers Baldwin or Ransweiler actions [sic], when shooting at the vehicle, were unreasonable, excessive, reckless, and/or in wanton disregard for the safety of innocent bystanders in the area. [¶] . . . [T]he Court finds insufficient evidence has been presented to establish that the conduct of Officer Ransweiler was unreasonable or excessive. As such, summary adjudication as to Plaintiffs' first cause of action for negligence [is] . . . granted as to Officer Ransweiler."

With regard to the battery cause of action, the trial court stated: "The test for determining whether a homicide was justifiable under Penal Code section 196 is whether the circumstances 'reasonably created a fear of death or serious bodily harm to the officer or to another.' [Citation.] Here, it is undisputed that Jorge Ojeda Jr. ('Ojeda'), a murder suspect with a felony no-bail warrant for a parole violation[,] was fleeing arrest. [Citation.] Ojeda drove his Jeep toward Baldwin and Ransweiler and reasonably created a fear of injury to these officers and/or other patrons at the mall. Thus, the Court finds that the use of deadly force on Ojeda was justifiable homicide under PC §196. Accordingly, the doctrine of transferred intent does not apply to the factual circumstances herein. Thus, summary adjudication as to Plaintiffs' claims for assault and battery is granted."

---

[7] The Browns have not challenged the court's evidentiary ruling on appeal.

[8] The court granted summary adjudication of the Browns' battery claim as to Baldwin, but denied summary adjudication as to their negligence cause of action against him.

[9] This appeal involves the Browns' claims against Ransweiler, only.

On appeal, the Browns assert that the trial court made two fundamental errors in granting summary adjudication of the claims as to Ransweiler. First, the Browns contend that the trial court improperly disregarded Ransweiler's preshooting conduct in assessing their claims of negligence against him. According to the Browns, the trial court erred in concluding that the "pre-shooting tactical decisions of the officers not to approach Ojeda until after he returned to his Jeep [was] not a proper basis for negligence." In addition, the Browns assert that the trial court failed to acknowledge the existence of triable issues of material fact that their expert's declaration raised with respect to both claims.

We conclude that the trial court properly granted summary adjudication of the Browns' claims as to Ransweiler. Even assuming that the trial court should have considered Ransweiler's preshooting tactical decisions in assessing the negligence claim, the evidence and inferences that may be drawn in favor of the Browns from that evidence do not create a material, triable issue of fact as to whether Ransweiler met his duty to act reasonably under the circumstances. Ransweiler's actions were objectively reasonable as a matter of law, such that he could not be found to have acted negligently with regard to his role in the Ojeda shooting.

Ransweiler's reasonable use of force against Ojeda also precludes a finding of liability on the cause of action for battery. Further, the privilege afforded to Ransweiler's conduct pursuant to Penal Code section 196 precludes liability as to the battery claim. We therefore affirm the trial court's grant of summary judgment in favor of Ransweiler.

A.  *Summary judgment standards*

Summary judgment is granted when a moving party establishes the right to the entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A "party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) Once the moving party meets this initial burden, the burden then shifts to the party opposing summary judgment to establish, by means of competent and admissible evidence, that a triable issue of material fact still remains. (*Id.* at pp. 850–851.)

"An issue of fact can only be created by a conflict of evidence. It is not created by 'speculation, conjecture, imagination or guess work.' [Citation.] Further, an issue of fact is not raised by 'cryptic, broadly phrased, and conclusory assertions' [citation], or mere possibilities [citation]. 'Thus, while the court in determining a motion for summary judgment does not "try" the

case, the court is bound to consider the competency of the evidence presented.' [Citation.]" (*Sinai Memorial Chapel v. Dudler* (1991) 231 Cal.App.3d 190, 196–197 [282 Cal.Rptr. 263].)

On appeal, the reviewing court makes " 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law. [Citations.]' " (*Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1143 [29 Cal.Rptr.3d 144], quoting *Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222–223 [38 Cal.Rptr.2d 35].) A trial court's ruling granting summary judgment may be affirmed on appeal if it is proper upon any theory of law applicable to the case. (*Farron v. City and County of San Francisco* (1989) 216 Cal.App.3d 1071, 1074 [265 Cal.Rptr. 317].)

B.  *Summary adjudication of the battery cause of action was appropriate*

The Browns contend that there was conflicting evidence "concerning the reasonableness of the use of force" with respect to the battery claim. They assert that this is not a case in which a trial court has already acquitted Ransweiler of criminal liability by finding that the shooting was justified (see *Gilmore v. Superior Court* (1991) 230 Cal.App.3d 416, 418 [281 Cal.Rptr. 343] (*Gilmore*)), and they maintain that the facts were in dispute on summary judgment. According to the Browns, the trial court ignored their expert's testimony that the force Ransweiler used was unreasonable. We conclude that the trial court correctly granted summary adjudication of the Browns' battery claim as to Ransweiler, because the undisputed facts establish that Ransweiler's shooting of Ojeda—on which Paula's battery claim is based— was an objectively reasonable use of force under the law and was privileged under Penal Code section 196.

1.  *The force Ransweiler used was reasonable as a matter of law*

■ The Browns contend that there remain triable issues of fact with respect to whether Ransweiler's use of force in shooting at Ojeda was reasonable, for purposes of their state law battery claim.[10] The elements of civil battery are (1) defendant intentionally performed an act that resulted in a

---

[10] The Browns do not suggest that law enforcement officers owe bystanders a duty different from the duty they owe to a suspect, which is the duty to use reasonable force under the totality of the circumstances, and we have found no authority that would support the existence of a different duty. Further, with respect to their battery claim, the Browns attempt to hold Ransweiler liable on a "transferred intent" theory, such that he could be liable to the Browns only if he could be liable to Ojeda for battery. Thus, presuming that Ransweiler could

harmful or offensive contact with the plaintiff's person; (2) plaintiff did not consent to the contact; and (3) the harmful or offensive contact caused injury, damage, loss or harm to plaintiff. (*Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1495 [21 Cal.Rptr.3d 36].)

■ An officer " 'may use reasonable force to make an arrest, prevent escape or overcome resistance, and need not desist in the face of resistance.' " (*Munoz v. City of Union City* (2004) 120 Cal.App.4th 1077, 1102 [16 Cal.Rptr.3d 521] (*Munoz*), citing Pen. Code, § 835a.) " 'Unlike private citizens, police officers act under color of law to protect the public interest. They are charged with acting affirmatively and using force as part of their duties, because "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." [Citation.]' " (*Munoz, supra*, 120 Cal.App.4th at p. 1109.) " '[Police officers] are, in short, not similarly situated to the ordinary battery defendant and need not be treated the same. In these cases, then, ". . . the defendant police officer is in the exercise of the privilege of protecting the public peace and order [and] he is entitled to the even greater use of force than might be in the same circumstances required for self-defense. . . ." [Citation.]' " (*Ibid.*)

A state law battery claim is a counterpart to a federal claim of excessive use of force. In both, a plaintiff must prove that the peace officer's use of force was unreasonable. (*Munoz, supra*, 120 Cal.App.4th at p. 1102, fn. 6.)[11] "Claims that police officers used excessive force in the course of an arrest, investigatory stop or other 'seizure' of a free citizen are analyzed under the reasonableness standard of the Fourth Amendment to the United States Constitution." (*Munoz, supra*, at p. 1102, citing *Graham v. Connor* (1989) 490 U.S. 386, 395 [104 L.Ed.2d 443, 109 S.Ct. 1865] (*Graham*).) The question is whether a peace officer's actions were objectively reasonable based on the facts and circumstances confronting the peace officer. (*Munoz, supra*, 120 Cal.App.4th at p. 1102.) The test is " 'highly deferential to the police officer's need to protect himself and others.' " (*Ibid.*)

■ " 'The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. [Citation.] . . . [T]he question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. [Citations.]' " (*Martinez v. County of Los Angeles* (1996) 47 Cal.App.4th

theoretically be liable for a battery to the Browns under a transferred intent theory, if Ransweiler's use of force was objectively reasonable as to Ojeda, it was necessarily reasonable as to the Browns, as well.

[11] Because federal civil rights claims of excessive use of force are the federal counterpart to state battery and wrongful death claims, federal cases are instructive in this area. (*Munoz, supra*, 120 Cal.App.4th at p. 1102, fn. 6.)

334, 343 [54 Cal.Rptr.2d 772] (*Martinez*), quoting *Graham, supra*, 490 U.S. at pp. 396–397.) In calculating whether the amount of force was excessive, a trier of fact must recognize that peace officers are often forced to make split-second judgments, in tense circumstances, concerning the amount of force required. (*Edson v. City of Anaheim* (1998) 63 Cal.App.4th 1269, 1273 [74 Cal.Rptr.2d 614] (*Edson*).)

 " 'We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.' [Citation.]" (*Martinez, supra*, 47 Cal.App.4th at p. 343.) Placing the burden of proof on the plaintiff to establish that an officer's use of force was unreasonable "gives the police appropriate maneuvering room in which to make such judgments free from the need to justify every action in a court of law." (*Edson, supra*, 63 Cal.App.4th at pp. 1273–1274.)

Where potential danger, emergency conditions, or other exigent circumstances exist, " '[t]he Supreme Court's definition of reasonableness is . . . "comparatively generous to the police . . . ." ' [Citation.]" (*Munoz, supra*, 120 Cal.App.4th at p. 1103.) " 'In effect, "the Supreme Court intends to surround the police who make these on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases. . . ." [Citation.]' " (*Ibid.*) A police officer's use of deadly force is reasonable if " ' "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." [Citations.]' [Citation.]" (*Ibid.*) " 'Thus, "an officer may reasonably use deadly force when he or she confronts an armed suspect in close proximity whose actions indicate an intent to attack." ' [Citation.]" (*Ibid.*)

 ■ Ojeda's actions clearly indicated his intent to harm the officers. In response to a strong show of force by officers in raid gear who ordered Ojeda to get out of his vehicle, Ojeda instead drove his vehicle up onto the sidewalk adjacent to the strip mall, "gunned" the engine, and drove directly toward Ransweiler and Baldwin. After Ransweiler dove out of the way, he saw Baldwin fall to the ground while still in front of Ojeda's vehicle. Ransweiler's fear that Ojeda would run over Baldwin was reasonable given these circumstances.

Once Ojeda took this extreme action in response to police orders to surrender, Ransweiler acted reasonably in shooting at him to attempt to stop Ojeda from harming Baldwin or a third party, or escaping. Ransweiler's use of force was not excessive or unreasonably dangerous relative to the danger Ojeda's actions posed. Ransweiler shot at Ojeda five times, from a relatively

close distance. Ransweiler did not shoot into a crowd. Rather, he shot in a direction away from buildings in the strip mall. In view of the exigency of the circumstances he was facing, Ransweiler met his duty to use reasonable care in employing deadly force.

The Browns contend that they raised a triable issue of material fact with regard to whether Ransweiler committed a battery. They complain that the trial court ignored their expert's testimony that Ransweiler's use of force was unreasonable. After reviewing the entire record, we conclude that the trial court was correct in determining that the relevant facts were not in dispute, and that the Browns have not raised triable issues of fact, despite their attempt to do so through their expert's declaration. Specifically, although the Browns assert that a number of the facts that Ransweiler listed as undisputed in his motion for summary judgment were actually in dispute, a careful review of the evidence reveals that no disputes as to material fact exist.

In claiming that material issues of disputed fact exist, the Browns rely primarily on the declaration of their expert, Roger Clark, a retired police officer with more than 27 years of police experience. The Browns assert that their expert's declaration is "entitled to a favorable interpretation." Citing *Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 125 [59 Cal.Rptr.3d 618] (*Powell*), the Browns insist that this means that Clark's declaration " 'did not have to be detailed, was entitled to all favorable inferences and [should have been] deemed sufficient to defeat the summary judgment motion.' " If the only problem with Clark's declaration was that it was insufficiently detailed, we would agree with the Browns that the declaration could provide sufficient support for their claimed dispute of fact. However, Clark's declaration suffers from more significant deficiencies.

A motion for summary judgment "must be decided upon admissible evidence in the form of affidavits, declarations, admissions, answers to interrogatories, depositions and matters of which judicial notice shall or may be taken. [Citation.] [¶] Personal knowledge and competency must be shown in the supporting and opposing affidavits and declarations. [Citations.] [¶] The affidavits must cite evidentiary facts, not legal conclusions or 'ultimate' facts. [Citation.]" (*Hayman v. Block* (1986) 176 Cal.App.3d 629, 638–639 [222 Cal.Rptr. 293] (*Hayman*).)

"A properly qualified expert may offer an opinion relating to a subject that is beyond common experience, if that expert's opinion will assist the trier of fact. [Citation.] Even so, the expert opinion may not be based on assumptions of fact that are without evidentiary support or based on factors that are speculative or conjectural, for then the opinion has no evidentiary value and does not assist the trier of fact. [Citation.]" (*Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493, 510 [11 Cal.Rptr.3d 653].)

" '[A]n expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based. [Citations.]' [Citation.]" (*Powell, supra*, 151 Cal.App.4th at p. 123.) Thus, in order "[t]o defeat summary adjudication, plaintiffs [cannot] rely on assertions that are 'conclusionary, argumentative or based on conjecture and speculation,' but rather [are] required to 'make an independent showing by a proper declaration or by reference to a deposition or another discovery product that there is sufficient proof of the matters alleged to raise a triable question of fact . . . .' [Citation.]" (*Roberts v. Assurance Co. of America* (2008) 163 Cal.App.4th 1398, 1404 [78 Cal.Rptr.3d 361].)

Most significant for our purposes is "[t]he general rule . . . that conclusions of fact are not binding on a summary judgment motion. [Citation.]" (*Hope Internat. University v. Superior Court* (2004) 119 Cal.App.4th 719, 739, fn. 9 [14 Cal.Rptr.3d 643], citing *Hayman, supra*, 176 Cal.App.3d at p. 639.) The Browns rely principally on the fact that Clark "conclusively determined after review of all the evidence available to him that Respondent Ransweiler's use of force was excessive and unreasonable." Clark states in his declaration, "It is my opinion that the force used in this case was excessive and unreasonable. The officers' use of deadly force in firing their weapons was not justified or necessary under the circumstances. Each officer who fired rounds on August 5, 2004, engaged in conduct which amounts to a deliberate indifference to the lives of persons at the strip mall, including Paula Brown and Jonathan Brown." However, as is true of nearly all of the other statements in the declaration, Clark reaches a conclusion as to the ultimate issues in dispute, i.e., whether Ransweiler acted reasonably or was justified in shooting Ojeda, without providing any reasoned explanation as to why the underlying facts lead to his ultimate conclusion. In another paragraph, Clark opines "that the firing of rounds by Officer Robert Ransweiler was not only unreasonable for the circumstances, but in fact reckless and wanton disregard for the safety of the public in the area." Again, Clark provides no reasoned explanation as to why he reached this conclusion.

A number of the opinions that Clark offers in his declaration appear to be based on conjecture, rather than on actual evidence. Clark was not present at the scene of the shooting. He states that his opinions are based on his review of the deposition transcripts of the officers, the officer involved shooting investigation report prepared by the San Diego Sheriff's Department, and photographs of the scene, the officers, Paula, the weapons involved, and the

Jeep.[12] Based on his review, Clark reaches a number of surprising conclusions. For example, he contends that it is his "opinion that Officers Baldwin and Ransweiler knowingly and willfully placed themselves in a situation where a vehicle was coming in their direction. Officers Baldwin and Ransweiler had a sufficient amount of time to move out of the way of the Jeep vehicle. In fact, Officer Ransweiler moved out of the way; yet, Officer Baldwin chose to continue to go towards the Jeep instead of simply moving a few steps off the sidewalk."

Clark cites to no portion of the officer's declarations or other evidence to support these conclusions. In fact, the available evidence demonstrates that as the officers were on the sidewalk walking toward Ojeda, his vehicle was still parked, and that Ojeda's vehicle suddenly jumped the curb and headed toward the officers. The facts in the record thus do not support Clark's conclusion that Ransweiler and Baldwin "knowingly and willfully placed themselves in a situation where a vehicle was coming in their direction." Further, all of the officers testified that the events occurred quickly, and corroborated that Ojeda accelerated toward Ransweiler and Baldwin. The evidence in the record also demonstrates that Baldwin was unable to get out of the way of Ojeda's Jeep due to Baldwin's location in relation to the parked cars that were next to him. Without providing some evidentiary basis for his assertion that Baldwin "chose to continue to go towards the Jeep instead of simply moving a few steps off the sidewalk," Clark's opinion constitutes mere conjecture.

Despite the Browns' assertions to the contrary, Clark's declaration fails to demonstrate the existence of material disputes of fact. For example, Ransweiler offered the following as undisputed facts, with appropriate citation to the evidence supporting these facts: "RANSWEILER, in fear for his life, dove to his left between parked cars. BALDWIN, who was following only a step or two behind RANSWEILER, could not do the same as his escape to the left was now blocked by cars." In response, the Browns claimed that this fact was in dispute, citing paragraph 33 of their separate statement to establish the existence of a dispute. However, the paragraph that they cite states simply, "It is clear that a round fired by Officer Baldwin impacted Paula Brown." This fact, even if true, does not place in question the truth of the statements that Ransweiler feared for his life, that Ransweiler dove between parked cars, or that Baldwin was unable to dive between the parked cars.

---

[12] Clark also stated that he "considered and reviewed the pertinent policy and procedures for the San Diego Police Department, El Cajon Police Department and State of California." However, the trial court sustained Ransweiler's objection to all references Clark made to the El Cajon Police Department policies and procedures. The Browns do not challenge this evidentiary ruling on appeal. We therefore may not consider portions of Clark's declaration that refer to these policies and procedures.

Paragraph 28 of the Browns' separate statement of facts includes an assertion that could, in theory, place Ransweiler's factual assertions in dispute. Paragraph 28 includes Clark's opinion, discussed above, that Baldwin and Ransweiler both had sufficient time to get out of Ojeda's way, and that Baldwin "chose to continue to go towards the Jeep instead of simply moving a few steps off the sidewalk." However, the only "evidence" that the Browns cite as support for this fact is Clark's opinion, set forth in his declaration. Clark had no personal knowledge of what Baldwin or Ransweiler could have done in the circumstances. Clark cites to no evidence in the documents he reviewed that would support his conclusory allegations. Clark's statement is speculative, and is not tied to any evidence in the record. We are thus compelled to reach the conclusion that the officers' recited facts regarding their relative abilities to get out of the way of Ojeda's vehicle were not actually in dispute, since the Browns offered no sufficient evidence that would place these facts in dispute.

The Browns similarly dispute the officers' assertions that after Ojeda jumped the curb, he then "gunned the vehicle, turning to his right, pointing the vehicle in an easterly direction directly at officers RANSWEILER and BALDWIN," and that "Ojeda then began to drive his Jeep at a high rate of speed directly at officers RANSWEILER and BALDWIN." However, the bases for the Browns' dispute of these factual assertions are Clark's unsupported conclusion that the officers who eventually fired on Ojeda "each had the opportunity to individually and jointly detain and arrest Ojeda before he entered a vehicle that can be used as a deadly weapon," and Clark's statement that Ojeda was on the sidewalk in plain view of the officers for 10 to 15 minutes, and that there was no evidence that he had a weapon. It is unclear how either of Clark's statements, even if believed, would place in dispute the fact that Ojeda drove toward Officers Baldwin and Ransweiler at a high rate of speed. Again, the Browns have made no showing that this fact is in dispute. Undisputed, this fact establishes circumstances sufficient to create an objectively reasonable fear on Ransweiler's part that Ojeda would run into the officers with his vehicle, and that Ojeda was attempting to evade arrest.

The fact that "RANSWEILER's shots were fired after he placed himself between the dental office and Ojeda's [J]eep and, as such, were fired in a generally southerly direction away from the dental office," as set forth in Ransweiler's separate statement of undisputed facts, also supports the objective reasonableness of Ransweiler's use of deadly force. The Browns claim that this fact was in dispute, but again failed to establish the existence of an actual dispute. The Browns cite to paragraph 29 of their separate statement of facts, which reads, "In violation of police standards, Officer Baldwin positioned himself in the path of the Jeep solely in order to prevent Ojeda from fleeing. This action created a dangerous situation that did not justify the use of a firearm by any of the officers at the scene." However, Baldwin's position

in relation to Ojeda's jeep says nothing about Ransweiler's location at the time he shot Ojeda, and it therefore does not create a dispute over Ransweiler's location. The Browns also cite to a portion of the deposition of criminalist Lance Martini as evidentiary support for the existence of a material dispute of fact as to this issue. However, that portion of Martini's deposition involves his finding that two projectiles discharged by Agent Torphy entered the area of suite 122 in the mall. Evidence regarding shots fired by Trophy does not place in dispute the fact that Ransweiler fired in a direction away from the building in which the Browns were located.

The Browns have not demonstrated that any material facts are in dispute. Based on the facts that remain undisputed, we can conclude as a matter of law that Ransweiler acted reasonably in deciding to use, and in using, deadly force against Ojeda. We further conclude that because Ransweiler's use of force against Ojeda was reasonable, Ransweiler may not be held liable to the Browns for battery for any injury that may have resulted from that same use of force.

### 2. *Ransweiler is immune from liability for his shooting of Ojeda, under Penal Code section 196*

"Under Penal Code section 196, a police officer who kills someone has committed a justifiable homicide if the homicide was 'necessarily committed in overcoming actual resistance to the execution of some legal process, or in the discharge of any other legal duty' or when 'necessarily committed in retaking felons who have been rescued or who have escaped . . . and who are fleeing from justice or resisting such arrest.' [Citation.] There can be no civil liability under California law as the result of a justifiable homicide. [Citations.]" (*Martinez, supra*, 47 Cal.App.4th at p. 349; see also *Gilmore, supra*, 230 Cal.App.3d 416 [a justifiable homicide is a privileged act, which precludes all tort liability arising from that act].)

"The test for determining whether a homicide was justifiable under Penal Code section 196 is whether the circumstances 'reasonably create[d] a fear of death or serious bodily harm to the officer or to another.' [Citations.]" (*Martinez, supra*, 47 Cal.App.4th at p. 349.) There is undisputed evidence that Ojeda, who was wanted for murder and was known to have violated his parole, drove his vehicle toward both Ransweiler and Baldwin on a walkway not intended for vehicles, after officers had ordered him to get out of the vehicle. It is undisputed that as Baldwin was trying to back away from the vehicle, he tripped and fell to the ground. Although the Browns suggest that there is some dispute as to whether Baldwin remained on the ground or was able to immediately get up, this fact is immaterial, because regardless of whether Baldwin remained on the ground or got back to his

feet, another officer's fear for Baldwin's safety under the circumstances was objectively reasonable. Because the circumstances " 'reasonably create[d] a fear of death or serious bodily harm' " to Baldwin, we conclude that Penal Code section 196 provides Ransweiler with immunity from Paula's state law battery claim.

C. *Summary adjudication of the negligence cause of action was appropriate*

The Browns contend that the trial court imposed the wrong standard of care with regard to their negligence claim, and that the trial court improperly weighed the evidence. After reviewing the record, we conclude that the trial court was correct in granting summary adjudication as to Ransweiler with respect to the Browns' negligence cause of action.

■ The elements of a negligence cause of action are: (1) a legal duty to use due care; (2) a breach of that duty; (3) the breach was the proximate or legal cause of the resulting injury; and (4) actual loss or damage resulting from the breach of the duty of care. (*Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 917 [50 Cal.Rptr.2d 309, 911 P.2d 496].) " 'The existence of a duty of care is a question of law to be determined by the court alone. [Citations.] This is because "legal duties are . . . merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done." [Citation.] Duty is simply a shorthand expression for the sum total of policy considerations favoring a conclusion that the plaintiff is entitled to legal protection. [Citation.]' [Citations.]" (*Munoz, supra,* 120 Cal.App.4th at pp. 1093–1094.) Under established law, police officers have a duty "to use reasonable care in deciding to use and in fact using deadly force." (*Id.* at p. 1101.) An "officer's lack of due care can give rise to negligence liability for the intentional shooting death of a suspect." (*Munoz v. Olin* (1979) 24 Cal.3d 629, 634 [156 Cal.Rptr. 727, 596 P.2d 1143].)

As we have already concluded in analyzing the Browns' battery claim, Ransweiler's decision to use deadly force and his use of deadly force were objectively reasonable under the circumstances. As a result, Ransweiler met his duty "to use reasonable care in deciding to use and in fact using deadly force" (*Munoz, supra,* 120 Cal.App.4th at p. 1101), and, as a matter of law, cannot be found to have been negligent in this regard.

There remains an open question, however, whether an officer's lack of due care with respect to preshooting tactical decisions can give rise to liability for negligence. Ransweiler and the Browns spend a significant portion of their briefing on appeal disputing whether Ransweiler and the other law enforcement officers owed the Browns a duty with regard to preshooting tactical

decisions that officers made—not just their decision to use deadly force. With respect to this issue, the Browns complain that the court applied the incorrect standard of care to their negligence claim.

Citing *Edson, supra,* 63 Cal.App.4th 1269 and *Munoz, supra,* 120 Cal.App.4th 1077, Ransweiler asserts that police officers cannot be held liable for decisions regarding when and how they decide to arrest a suspect—what Ransweiler terms "tactical negligence." Acknowledging that this court has not specifically held that law enforcement officers may not be held liable for "tactical negligence," Ransweiler contends that *Edson,* which dealt with a battery claim only, "provides ample support for announcing this rule." In *Munoz,* a case that did involve claims of negligence, the court specified that officers who are responding to public safety emergencies and whose efforts prove ineffective owe no duty of care with respect to their decisions as to how to deploy officers, the efforts made to defuse the situation safely, and other factors preceding the use of force. (*Munoz, supra,* 120 Cal.App.4th at pp. 1097–1098.) Ransweiler asserts that under the reasoning of *Edson* and *Munoz,* he may not be held liable for negligence for any preforce tactical decisions he may have made.

The Browns contend that judicial precedent demonstrates that an officer's duty to act reasonably extends to police decisions beyond simply the decision to use deadly force, and includes police tactics and the manner of apprehending suspects. The Browns refer to *Grudt v. City of Los Angeles* (1970) 2 Cal.3d 575 [86 Cal.Rptr. 465, 468 P.2d 825], and *Munoz v. Olin, supra,* 24 Cal.3d 629, to demonstrate that courts may look at an "officer's entire performance . . . in determining negligence liability." In both *Grudt* and *Munoz v. Olin,* the Supreme Court permitted negligence claims to proceed against officers based on grounds extending beyond the officers' use of force. *Grudt* involved decisions by plainclothes officers to apprehend a victim without waiting for uniformed officers to arrive, and to tap on the victim's window with a shotgun despite being in plain clothes in a high crime area at night. (See *Grudt, supra,* 2 Cal.3d at p. 587.) *Munoz v. Olin* involved police officers' mistaken identification of the victim as a suspect, their failure to warn the victim before shooting him, and their failure to attempt other means of apprehending him. (See *Munoz v. Olin, supra,* 24 Cal.3d at p. 637.)

The Browns maintain that the rule of no negligence for the tactical decisions of law enforcement officers, announced in *Munoz, supra,* 120 Cal.App.4th at pages 1096–1098, and *Adams v. City of Fremont* (1998) 68 Cal.App.4th 243 [80 Cal.Rptr.2d 196], a case on which *Munoz* heavily relies, applies only in situations like the ones officers faced in those cases, i.e., emergency situations (such as suicide attempts) to which police have been summoned by the public. Here, the officers were not responding to an

emergency call from the public, but instead, the officers had initiated surveillance of a suspect and subsequently decided to make an arrest.

We conclude that determining whether Ransweiler had a duty of reasonable care with respect to his preshooting tactical decisions is irrelevant in this case because even if we presume that the Browns are correct that Ransweiler *could* be held liable for tactical negligence, under the facts presented in the summary judgment proceedings, Ransweiler's conduct was objectively reasonable under the circumstances.

The Browns cite a number of "facts" that they contend create a "reasonable doubt [as to whether Ransweiler] was negligent." Those facts are (1) several stores in the strip mall were open and doing business at the time Ransweiler surveilled and ultimately shot Ojeda; (2) Ransweiler placed himself in a situation where he could not see the suspect; (3) there is a lack of evidence that Ransweiler "communicated his plans of approach" to other officers, from which one can infer that he "unilaterally decided on an approach to the suspect, which placed him and his partner Baldwin in a situation of danger"; (4) Ransweiler approached Ojeda's vehicle with his gun drawn, from which one can infer that he was "careless in that [he] greatly increased the tension of the situation"; (5) Ransweiler failed to warn the suspect before shooting him and did not make "any effort to warn . . . Ojeda to stop the Jeep"; (6) Ransweiler was right next to the driver's door when he shot at Ojeda, and Ransweiler had moved around to that side of the vehicle and crouched behind a trash can, waiting for Ojeda to back up toward him, from which one can infer that he "could have attempted some other method of subduing Ojeda before firing on him" or could have "attempted . . . other means of apprehension"; (7) Ojeda's Jeep was blocked in by at least one patrol car, and there was no evidence that Ojeda could have escaped by driving on the sidewalk, from which one can infer that Ojeda would not have been able to escape; (8) there was no evidence that any civilians were present on the sidewalk and in danger; and (9) Ransweiler "abandon[ed]" Baldwin "on the sidewalk in front of a potentially moving Jeep."

Viewing all of these alleged facts and the inferences to be drawn from them in favor of the Browns, it is still clear that Ransweiler's conduct in these circumstances met the standard of a reasonably prudent police officer. The undisputed facts establish that Ransweiler was aware that Ojeda was a murder suspect who was the subject of a warrant for a parole violation. Faubel ordered Ransweiler and the other officers at the scene to move in to apprehend Ojeda. Under the circumstances, it was objectively reasonable for Ransweiler to approach Ojeda with his firearm drawn. It was similarly objectively reasonable for officers to attempt to surround Ojeda from all sides, including from the sidewalk. In fact, Ransweiler and other officers

might have been negligent if they had *not* sought to prevent Ojeda from escaping into one of the businesses at the mall. Moreover, the Browns do not explain why or how Ransweiler's positioning himself in a location where he could not see Ojeda—which occurred before Ransweiler and Baldwin even approached Ojeda—could have constituted a negligent act or how it had anything to do with Paula's injuries.

Even if one could infer that Ojeda would not have been able to escape by driving on the sidewalk, as the Browns suggest, the facts still establish that Ojeda's conduct in driving on the sidewalk toward the officers clearly placed both Ransweiler and Baldwin in danger. Further, as the Browns acknowledge, there were patrons in the stores and offices at the strip mall that day. Ojeda's conduct in driving onto the sidewalk, either in an attempt to escape the police or to harm the officers who were on the sidewalk, created a risk of danger not only to the police officers, but also to others in the vicinity, regardless of whether Ojeda would have been able to escape. Ransweiler was not unreasonable in reacting to the danger that Ojeda posed to him and Baldwin, and potentially to innocent bystanders.

The Browns' suggestion that Ransweiler could have attempted some other means of apprehending Ojeda because he was close to Ojeda's driver's side door is pure conjecture, and does not establish that Ransweiler's actual response to the situation was unreasonable. It is similarly insufficient to raise a question of fact as to Ransweiler's negligence to suggest that Ransweiler could have warned Ojeda that he was about to shoot, or that Ransweiler should not have approached Ojeda with his gun drawn, or that he should not have "abandoned" Baldwin—whatever that means. It simply is not reasonable to believe that even if Ransweiler had done one or all of these things, he somehow would not have had to shoot Ojeda in order to prevent Ojeda from escaping or from harming Baldwin or other officers. Further, while it is easy, with the benefit of hindsight, to make suggestions as to how Ransweiler might have responded differently to the situation, the fact that Ransweiler and the other officers were making these decisions in real time and in response to rapidly changing circumstances is a factor to consider in determining the reasonableness of their actions. (See *Martinez, supra,* 47 Cal.App.4th at p. 343.)

The law has never been applied to suggest that there is only one reasonable action that an officer may take under a given set of circumstances. There will virtually always be a *range* of conduct that is reasonable. As long as an officer's conduct falls within the range of conduct that is reasonable under the circumstances, there is no requirement that he or she choose the "most reasonable" action or the conduct that is the least likely to cause harm and at the same time the most likely to result in the successful apprehension of a

violent suspect, in order to avoid liability for negligence. It would be unreasonable to require police officers in the field to engage in the sort of complex calculus that would be necessary to determine the "best" or most effective and least dangerous method of handling an immediate and dangerous situation, particularly when officers are forced to make split-second decisions under tense and often perilous conditions.

The Browns appear to have retreated somewhat from the position they raised in opposition to the motion for summary judgment that Ransweiler was negligent in not attempting to arrest Ojeda before Ojeda returned to his vehicle, which Ojeda was then able to use as a deadly weapon. It is clear that the Browns could not prevail on such a theory. The undisputed facts establish that Ransweiler was not in charge of the decision as to when police would arrest Ojeda. Rather, all of the evidence demonstrated that it was Faubel who made the decision that officers would move in to arrest Ojeda only after Ojeda returned to his car.

The Browns assert that the facts related to Faubel's decisionmaking were disputed. However, once again, the only "evidence" on which they rely in attempting to demonstrate the existence of a material factual dispute as to Faubel's role in deciding when officers would arrest Ojeda is Clark's claim that the officers who eventually fired on Ojeda "each had the opportunity to individually and jointly detain and arrest Ojeda before he entered a vehicle that can be used as a deadly weapon," and Clark's statement that Ojeda was on the sidewalk in plain view of the officers for 10 to 15 minutes and that during that time, there was nothing to indicate that he had a weapon. The expert's conclusory statements do not place in dispute that it was Faubel, not Ransweiler, who devised the tactical plan and ordered the other officers, including Ransweiler, to wait until Ojeda was in his vehicle before moving in to arrest him.[13] Clark provides no factual basis for his assertion that any one of the officers could have arrested Ojeda before he entered his car. An officer attempting to do what Clark suggests would have had to have acted contrary to the VCTF leader's orders. Further, Clark offers no factual basis for his conclusion that such conduct would have been less dangerous than the approach that Faubel chose to utilize.

In sum, the Browns have raised no triable issues of material fact with respect to their negligence claim. The trial court's grant of summary adjudication of the negligence claim against Ransweiler was thus proper.

---

[13] Another fact that Ransweiler offered that supports the conclusion that he was not in charge of deciding when and how the arrest was to be executed was set forth in Ransweiler's separate statement of undisputed fact as, "Faubel ordered that marked units were to come in behind the Jeep to block Ojeda's potential escape." In the trial court, the Browns did not assert that this fact was in dispute.

## IV.

## DISPOSITION

We affirm the trial court's grant of summary judgment in favor of Ransweiler.

Huffman, Acting P. J., and Irion, J., concurred.