Filed 5/6/15  P. v. Bargerter CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL BARGERTER,<br><br>     Defendant and Appellant. | B251903<br><br>(Los Angeles County<br>Super. Ct. No. NA091141) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Richard R. Romero, Judge.  Affirmed.

Thomas K. Macomber, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Tita Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Michael Bargerter of assault on a peace officer in violation of Penal Code section 241, subdivision (c)[1] as a lesser included offense of assault with a deadly weapon (count 1) and the attempted murder of Officer Felipa Baccari in violation of sections 664, subdivision (a) and 187 (count 3). The jury found that the attempted murder was committed while Officer Baccari was engaged in the lawful performance of her duties as a peace officer within the meaning of section 664, subdivision (e). The court sentenced defendant to seven years to life with the possibility of parole in count 3 and one year in county jail for the misdemeanor offense in count 1.

Defendant appeals on the grounds that: (1) there was insufficient evidence to prove that Officer Baccari was engaged in the performance of her duties; and (2) the trial court violated defendant's due process right to present a complete defense when it prejudicially excluded evidence of Officer Baccari's training and experience, police practices and procedures, and expert opinion testimony. Defendant also requests this court to conduct an independent review of the sealed transcript of the *Pitchess*[2] hearing to determine whether additional information should have been disclosed.

**Prosecution Evidence**

On January 18, 2012, Officer Felipa Baccari was on patrol when she drove into an alley behind East Ocean Boulevard in Long Beach. Nearby residents frequently complained about transients going through the trash and recycling bins and making a disturbance. It is illegal in the City of Long Beach to dig through trash cans and remove recyclables from the recycling bins. Officer Baccari saw defendant digging in one of the recycling bins and asked him to stop and to move on. He said he would not and squatted down. Officer Baccari got out of her car and asked defendant to go to the front of her car, and he complied. When she requested identification, defendant gave Officer Baccari a photograph of himself that appeared to be a booking photograph. When she asked if he

---

[1]     All further references to statutes are to the Penal Code unless otherwise stated.

[2]     *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

was on parole or probation, he did not answer. He began yelling at Officer Baccari and ignored her efforts to calm him down.

Officer Baccari became alarmed. She believed defendant was going to "escalate" and do something out of the ordinary. She reached for her taser but then extracted her baton because she realized her taser would not work through defendant's multiple jackets. She told him to get down on his knees, and he refused. He asked, "Are you gonna hit me with that, bitch?" She said she would if he did not get down, and she asked for a unit to assist. After ordering him to his knees a third time, she took a swing at him, but he jumped back and she missed him. Defendant took a fighting stance and Officer Baccari tried to hit him again, but he picked her up off the ground and slammed her down onto the alley. His hands went to her neck and she felt the need for air. She tried to hit him on the head with the baton, but defendant grabbed the end of it and hit her on the head. Officer Baccari threw the baton away from both of them and tried to pull out her gun. She felt pressure on the gun and realized defendant had his hand on it. Because defendant was stronger than she, Officer Baccari feared he would take the gun and shoot her. She slammed the gun back into its holster and turned her body onto it, hoping backup would soon arrive. Suddenly "she felt that everything went really quiet" and she saw a black curtain begin to close.

As Officer Baccari began to black out, she did the only thing she could think of, which was to poke defendant in the eye with her thumb. It took him off guard to the point where he let go, and she began to scoot out from under him. Defendant grabbed her again, climbed on top of her and clamped on her neck. She had regained her breath and was able to punch him. She heard sirens and knew help was coming. She heard the tasers go off and felt defendant's weight taken off her.

Deborah Sue Smith's windows overlooked the alley. Smith has had problems with people going through the trash and recycling bins. They begin going through the bins at 4:00 a.m., and it sometimes continues until 10:00 p.m.

At approximately noon on the day of the incident, Smith heard a female voice from the alley saying, "Sir, stop. Sir, stop." Smith looked out the window and saw a

female police officer, later identified as Officer Baccari, approaching a male who was walking away from her. Smith identified the male as defendant. Defendant took another step, and Officer Baccari approached him. Defendant turned around and swung at Officer Baccari, who had her baton held up at her side. Defendant then grabbed the officer around the throat and threw her down onto the concrete. Smith at first stated she did not see Officer Baccari strike or attempt to strike defendant, but then testified she saw the officer raise the baton and bring it down toward defendant's back. She did not see it hit defendant.

Smith saw Officer Baccari land on her back. Defendant got on top of her. Officer Baccari was wriggling in an effort to break defendant's one-handed grip, and defendant was reaching down on the officer's side where she had her gun and was "trying to get to her gun." Defendant was "really squeezing her throat" with one hand. When defendant was unable to get the gun, defendant put his second hand around the officer's throat and squeezed. Officer Baccari went "just a little limp" at one point. Smith knew that the officer was in serious trouble and called 911.

Smith saw the first responding officer run towards defendant, who was still on top of Officer Baccari. The arriving officer used a stun gun on defendant. The stun gun had no effect, and defendant continued to squeeze Officer Baccari's neck. Three more police cars carrying five officers arrived and ran to Officer Baccari. An officer said, "'Let go,'" but defendant did not let go, and the officers began hitting defendant with their batons on the back of his arms, his back, and his legs. When defendant was finally carried to a patrol car, he said, "If I could get up from here, I'll kill all you son of a bitches."

Officer Salvadore Torres was the first to arrive at the scene, and he saw defendant choking Officer Baccari. Defendant ignored Officer Torres's order to get up and remained on top of Officer Baccari, squeezing her neck. When Officer Torres saw that defendant had no weapons, he decided to use a taser on defendant rather than extract his gun. Defendant was not affected by the taser. Defendant refused to comply with Officer Torres's orders to lie on his stomach. He began swinging his arms and legs at Officer Torres even after being struck in the arms and legs with the officer's baton. It was not

4

until four more police officers arrived and struck defendant with their batons on the back of his arms, his back, and his legs, that the officers were able to take defendant into custody. Defendant continued to struggle while being carried to the patrol car. Officer Torres also heard defendant say, "If I could get up from here, I'll kill all you son of a bitches."

Detective Jessica Delosh testified that she heard Officer Baccari's radioed call for assistance. As she drove to the scene, she heard a gasp for air over the radio. She stayed with Officer Baccari until paramedics arrived. Officer Baccari had a golf ball-sized knot on the right side of her head and red marks around her neck. She complained that her ribs, knees, and elbows hurt.

At the hospital, Officer Baccari answered the doctor's questions about how she received her injuries and gave a statement to Detective Delosh. Officer Baccari's neck was sore, her head and chest were hurt and she was in pain for more than three days. She had to remain off duty for six weeks so that her rib area could heal.

**Defense Evidence**

Dr. Mark Joyner treated Officer Baccari, who told him that she sustained trauma while trying to restrain a suspect who had been resisting arrest. Officer Baccari denied syncope or loss of consciousness associated with choking, paresthesis or numbness, weakness, tingling in the upper and lower extremities from trauma, and cervical spine tenderness. Officer Baccari reported sharp and stabbing chest pain to her right side, and pain when she moved or took a deep breath. She did not complain of shortness of breath. Dr. Joyner offered Officer Baccari narcotic pain medication, but she refused.

Officers Palacios and Potter did not see defendant on top of Officer Baccari when they arrived. Defendant was upright, and Officers Baccari and Torres were using their batons on him.

Yuseff Omowale's one-bedroom apartment faced the alley. At noon on the day of the incident, Omowale heard voices. A female voice sounded pleading, and a male voice was asking to be left alone and was increasingly agitated. When Omowale finally went to the window he saw a man on the ground being beaten with batons by two male police

5

officers.  The male was "essentially, begging for his life, begging to be left alone, that he was in severe pain."  Omowale also saw a female police officer lying in the alley.  Based on his observations, the situation escalated after the female officer said "Calm down."

Paul Kim is a retired Commander of the Los Angeles Police Department and expert in the use of force by officers.  He described the types of batons and the different techniques for wielding them.  In his expert opinion, Officer Baccari's baton was capable of causing great bodily injury or death regardless of the manner in which it was held or used.

Kim was of the opinion that the photograph defendant showed Officer Baccari was not a mug shot.  He also described deescalation techniques and methods for the jury.  He stated that the officer's "presence" meant a lot, as well as the officer's demeanor, tone of voice, ability to be clear and concise in communicating with the subject, and the officer being alert to what was occurring.  The officer had to assess whether "it is to escalate or deescalate, it's a changing situation so you need to be alert."

Defendant testified that he had pleaded guilty to felony burglary in 1994 and had been convicted of tampering with a vehicle in 2007.  At the time of the incident with Officer Baccari, he was homeless.  He walked along that alley every day on his way to Bixby Park.  He did not look in the recycling bins, but he did look in the trash for anything of value.  Defendant looked in the trash that day but did not recall taking anything out of the bins.

A police car came up behind defendant, and the officer inside, Officer Baccari, asked defendant if he was taking recyclables.  He replied he was not, and the officer asked what he was doing, why he was going down that alley, and what he did at the park.  Because it was hot and he was wearing a few layers of clothing while walking around all day, defendant sat down on the curb.  Seconds after telling defendant that he could leave, Officer Baccari "exploded."  She said, "Fuck it.  Hands on the car."  Officer Baccari asked defendant where he was going, if he had been drinking or using, and if he had identification.  Defendant showed her a paper he had found with the name "Rod Miller"

6

on it.  Since defendant had no identification and the person looked just like him, he thought it would be a good idea to have it.

The officer used "cuss words" the entire time she was speaking with him.  She was being "real aggressive."  Defendant felt "entrapped" and cornered and "being treated as less of an individual than what . . . [was] allowed."  At one point during the questioning, defendant decided to answer with a lyric from a song that was playing on the Walkman he was wearing.  He started singing it loudly.  He put some emphasis into it and the officer told him to "shut the fuck up" or she would hit him with her bat.

Defendant lost his temper at her cussing and trick questions.  He looked her straight in the eye and said, "You shut the fuck up."  His hands never left the hood of the car.  He began asking her why she was doing this to him.  It was not in a loud voice.  The officer pulled her bat out and raised it above her head, and he jumped back.  She then screamed into her radio.  Officer Baccari tried to hit him a second time, and he jumped back again.  There were three or four advances with the bat, and in between the officer managed to pull out her taser and shoot him.  He felt like he had hit an electric horse fence.  The officer did not tell defendant to get down on his knees before swinging at him, and he did not recall if she said it after the first swing.

After being tased, defendant managed to grab the bat when the officer swung at him again.  He decided to wrestle her to the ground.  He had wrestled in high school,  and he used a take-down move to make them both fall to the ground.  As he got on top of the officer, he felt a pang on the back of his neck and realized she was hitting him in the back of the head with the bat.  He reached up and grabbed it.  Officer Baccari was wriggling and defendant tried to control her and maintain his balance by placing one hand near the top of her chest, around her neck.  His intention was to keep her on the ground.  He did not want to hurt her in any way—he was just trying to stop her.  The hold he had on her was a legal restraining maneuver in wrestling.  Defendant had a "stiff arm" to her neck, but he was not squeezing.  He did not intend to kill her.

Defendant said that he and the officer had fought for the baton for approximately four seconds when he heard car doors slam.  He saw two officers running at him with

7

their batons out.  Defendant tried to run away but tripped and fell to the ground.  When the officers caught up with him, they beat him with their batons.  Defendant managed to crawl or run another 20 feet until five officers overpowered him and beat him continuously with their bats.

## DISCUSSION

### I.  Sufficiency of the Evidence

#### A.  *Defendant's Argument*

Defendant contends that Officer Baccari's use of force was excessive under the Fourth Amendment's standard of reasonableness, and this court should reverse the guilty verdict in count 1 and the true finding that the officer was engaged in the lawful performance of her duties in count 3.

#### B.  *Relevant Authority*

The Fourth Amendment's prohibition on "unreasonable . . . seizures" protects individuals from excessive force in the context of an arrest or seizure.  (U.S. Const., 4th Amend.; see *Graham v. Connor* (1989) 490 U.S. 386, 394 (*Graham*).)  "[C]laims [of excessive force] are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard . . . ."  (*Graham*, at p. 388.)  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of '"the nature and quality of the intrusion on the individual's Fourth Amendment interests"' against the countervailing governmental interests at stake. [Citation.]  Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.  [Citation.]  Because '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,' [citation], however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.  [Citation.]"  (*Id*. at p. 396.)

## C. Proceedings Below

CALCRIM No. 602 informed the jury that the People had to prove Officer Baccari was a peace officer lawfully performing her duties as a peace officer. The jury was told that the duties of a police officer include criminal investigation, detention, and arrest. The instruction states that a peace officer is not lawfully performing his or her duties if he or she is unlawfully arresting or detaining someone or using unreasonable or excessive force in his or her duties. CALCRIM No. 602 referred the jury members to CALCRIM No. 2670.

CALCRIM No. 2670 stated that the People had the burden of proving beyond a reasonable doubt that Officer Baccari was lawfully performing her duties. The instruction explained that a peace officer legally detains someone if specific facts, either known or apparent, lead the officer to suspect that the person to be detained is or is about to be involved in criminal activity, and a reasonable officer who knew the same facts would have the same suspicion. The jury was told to consider the officer's training and experience and all of the circumstances known to the officer when she detained the person.

CALCRIM No. 2670 also instructed the jury that "[s]pecial rules control the use of force." The rules given the jury were as follows: (1) "A peace officer may use reasonable force to arrest or detain someone, to prevent escape, to overcome resistance, or in self-defense." (2) "If a person knows, or reasonably should know, that a peace officer is arresting or detaining him or her, the person must not use force or any weapon to resist an officer's use of reasonable force." (3) "If a peace officer uses unreasonable or excessive force while detaining or attempting to detain a person, that person may lawfully use reasonable force to defend himself or herself." (4) "A person being arrested uses reasonable force when he or she[ ] uses that degree of force that he or she actually believes is reasonably necessary to protect himself or herself from the officer's use of unreasonable or excessive force; and[] uses no more force than a reasonable person in the same situation would believe is necessary for his or her protection."

9

### D. *Use of Force Reasonable*

Defendant contends that the facts and circumstances of the incident show that excessive force was used and the arrest was unlawful. He argues that the act of drawing the taser to compel defendant to shut up was "an act of excessive force because it was an unnecessary showing of force that portended immediate violence" to him. There was no lawful reason to tase defendant when all defendant did was refuse to stop yelling. According to defendant, the evidence showed defendant was nonthreatening, and he took a fight stance only after the officer tried to strike him two times with her baton. Defendant argues that Officer Baccari's motive was to punish defendant for his yelling.

We believe a finding that Officer Baccari was engaged in the lawful performance of her duties was not negated by an unreasonable use of force in this case. "With respect to a claim of excessive force, the . . . standard of reasonableness at the moment applies: 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' [citation], violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. [¶] As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. [Citations.]" (*Graham*, *supra*, 490 U.S. at pp. 396-397.)

In the instant case, the critical area of analysis is the sequence of events before defendant tackled Officer Baccari and slammed her down on the ground where he began choking her. Referring to the three factors mentioned in *Graham* as being among those to consider, defendant argues that the severity of his crime was "de minimus," he was nonviolent, and his refusal to go to his knees was reasonable. (See *Graham*, *supra*, 490 U.S. at p. 396.)

10

The record shows that Officer Baccari was aware that individuals whose residences faced the alley often complained about transients rifling through their trash and recycling bins. The complaints included the noise generated by this activity and the trash left lying around. Officer Baccari was also aware that it was against the law in Long Beach to go through trash and recycling bins and remove recyclable items. Officer Baccari saw defendant digging inside a recycling bin and looking in trash containers, and she asked him to stop and to move on. Defendant said he would not, thereby defying the officer's reasonable orders, and he squatted in the alley. She again asked him to move on and said, "Don't make me . . . give you a ticket."

Because defendant obviously did not intend to move on, Officer Baccari got out of her car and asked defendant to go to the front of her car, and he complied. When she asked for identification, defendant gave her a photograph that appeared to be a booking photograph of defendant. When she asked defendant if he was on parole or probation, he did not answer.

At that point defendant began yelling "at the top of his lungs" at Officer Baccari. She tried to calm him down by saying that a misdemeanor ticket was "not a big deal," but defendant continued to yell. The officer told him to shut up and relax, but he just yelled louder. Because his behavior was alarming, Officer Baccari believed he was going to "escalate," and it was possible he would do something "out of the ordinary." She extracted her taser "*in case* he [did] something that's not of the ordinary." (Italics added.) She put it away immediately, however, when she realized it would be ineffective. Contrary to defendant's assertions that Officer Baccari made "[a] decision to tase" defendant and "fully intended to tase [defendant]," there was no testimony that she intended to use it on defendant unless it was necessary. It was extracted as a cautionary move.

Officer Baccari then took out her baton and told defendant to get on his knees so that she could be in control of the situation—which consisted of a stronger, younger, and belligerent man directing his anger at a smaller police officer. Defendant refused to kneel and continued his angry words. When he asked her, "Are you gonna hit me with that,

11

bitch?"  Officer Baccari said she would if he did not get down on his knees.  Defendant had a choice.  As stated in *Graham*, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.  [Citation.]"  (*Graham*, *supra*, 490 U.S. at p. 396.)  Where there is potential danger, the Supreme Court's definition of reasonableness is comparatively generous to police.  (*Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 528.)

After asking defendant to go to his knees a third time, Officer Baccari took a swing at defendant but missed him when he jumped back.  She called for assistance and attempted to hit him again but missed.  Defendant took up a fighting stance.  Officer Baccari then attempted to hit defendant in the leg to get him on the ground, but at that point defendant picked her up off the ground and slammed her into the concrete, placing his hands around her neck.

We believe that although defendant complied with Officer Baccari's command to place his hands on the police car, his refusal to move on when asked in a friendly manner, which was the cause of the entire incident, was not cooperative.  Nor can his continuous shouting be called cooperative behavior.  A subject who is young and strong and screaming at the top of his lungs is enough to put any reasonable lone officer on guard and to cause that officer to take precautionary measures for self-defense or even to make a preemptive strike.  A reasonable officer would make an effort to take control of the situation by reducing the suspect's physical advantage over the officer.  "[A] police officer must have control over the manner and means of making an arrest or detention." (*Edson v. City of Anaheim* (1998) 63 Cal.App.4th 1269, 1273.)  Moreover, Officer Baccari had not patted down defendant and did not know what he had on his person, which was an important reason to have control over him.  She noted he was wearing a fanny pack in addition to several jackets.  In addition, the photograph defendant showed Officer Baccari indicated he had been incarcerated and was not a stranger to criminal acts.

We do not agree with defendant's assertions below that a reasonable officer would have tried to handcuff defendant and put him in the patrol car.  Any reasonable officer

would not wish to get that close to a suspect who is taller, younger, and clearly angry. When asked if another solution would not have been to return to the police car, roll up the windows and wait for backup, Officer Baccari stated she would not go back in the patrol car, roll up the windows, and lock the doors because, "That's not police work." Any reasonable officer would have believed, as did Officer Baccari, that he or she would not be doing his or her job to back away from every person who did not comply with his or her orders. An officer is not required to desist when faced with resistance. (*Brown v. Ransweiler*, *supra*, 171 Cal.App.4th at p. 527.)

Furthermore, section 835a provides that a "peace officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested; nor shall such officer be deemed an aggressor or lose his right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome resistance." Although it was not clear from the outset that defendant was to be arrested, and his conduct was clearly a determining factor in that possibility, it is not possible to make an arrest without a detention. (See *Evans v. City of Bakersfield* (1994) 22 Cal.App.4th 321, 330.) Defendant's conduct supports the fact that Officer Baccari's actions in attempting to control defendant were reasonable.

Defendant finds significant the fact that Officer Baccari testified at the preliminary hearing that she called for backup only after her second attempt to strike defendant, but we do not share this view. The point at which Officer Baccari called for backup in the swift-moving course of events is not as significant as defendant appears to believe. Whether it was after taking out her baton but before attempting to strike or after attempting to strike him twice is of no moment given the rapid sequence of events.

Succinctly stated, the constitutional issue is "whether the totality of the circumstances justif[ies] a particular sort of . . . seizure." (*Tennessee v. Garner* (1985) 471 U.S. 1, 8-9 (*Garner*).) "The Fourth Amendment has never been interpreted to '"require that police officers take unnecessary risks in the performance of their duties." [Citation.]'" (*People v. Collier* (2008) 166 Cal.App.4th 1374, 1378.) Officer Baccari was alone with a younger and larger man who was behaving in an angry, hostile, and

13

uncooperative manner, and there was a need to control him and the quickly changing situation. Ordering defendant to his knees and attempting to enforce the ignored order with a baton was reasonable to ensure the officer's safety and to enable her to conduct an investigation. (See, e.g., *People v. Avila* (1997) 58 Cal.App.4th 1069, 1072-1074 [although each individual factor may seem harmless in hindsight, when taken together, the officer had reasonable belief his safety was in danger where the defendant acted suspiciously, walked around his car, dropped an envelope, and had a metal object within reach].) On this record, we are satisfied that Officer Baccari's attempted use of force was lawful, and she was therefore engaged in the lawful performance of her duties. The conviction in count 1 and the true finding on the allegation in count 3 must stand.

## II. Exclusion of Evidence

### A. *Defendant's Argument*

Defendant contends the trial court violated his constitutional right to present a complete defense by excluding evidence of Officer Baccari's training and experience, general police practices and procedures in conducting arrests, and the opinion testimony of defense expert Paul Kim. The court erroneously made numerous rulings that the proffered evidence was not relevant.

### B. *Relevant Authority*

Only relevant evidence is admissible. (Evid. Code, § 350.) All relevant evidence is admissible, except as otherwise provided by statute. (Evid. Code, § 351.) Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive. [Citations.]" (*People v. Garceau* (1993) 6 Cal.4th 140, 177.) The trial court has wide discretion in determining the relevancy of evidence. (*Ibid*.) Evidence is irrelevant if it leads only to speculative inferences. (*People v. Morrison* (2004) 34 Cal.4th 698, 711.)

Evidence Code section 801 provides in pertinent part: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such opinion as is: [¶] (a)

Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ." (See also *People v. Valdez* (1997) 58 Cal.App.4th 494, 506.)

### C. Proceedings Below

Prior to trial, defense counsel issued a subpoena duces tecum for the police and procedure manual for the City of Long Beach Police Department, but the city objected. Counsel stated she planned to use the manual to show whether Officer Baccari and/or Officer Torres acted in their lawful duties as law enforcement officers.[3] The prosecutor argued that a policy does not indicate whether an officer was acting lawfully or the use of force was reasonable, and hence the manual was not relevant. The court agreed that the police department did not determine the standard. The jury would decide if the officers were acting within their lawful duty.

During trial, defense counsel continually attempted to elicit information regarding Officer Baccari's training and experience. The prosecutor's objections were generally sustained, or the court itself called for a sidebar, prompting defense counsel to withdraw her questions. Counsel ultimately accused the court of being hostile and conducting itself in a highly prejudicial manner. With respect to the defense expert, Paul Kim, the court ruled that defense counsel could not ask Kim's opinion as to whether normal police tactics are advisable when the officer is working alone or any other standard-of-conduct questions. The witness could not quote police practices and procedures. The court stated that expert opinion is not necessary for jurors to decide whether force was reasonable or excessive. The jurors were fully capable of deciding factual issues such as the pressure the officer was under, the pressure defendant was under, and whether things were escalating or deescalating. The court stated it would allow expert testimony that was "very factual," such as how each weapon worked. It was for the jury to decide "what happened, who did what, what were they thinking, and [was] that reasonable."

---

[3] Defendant was initially charged with violating section 69, resisting an executive officer, in relation to Officer Torres, but that count was dismissed before trial.

15

### D. No Abuse of Discretion or Constitutional Violation

Defendant argues the court's rulings were erroneous and prejudicial because it cannot be shown beyond a reasonable doubt that the jury would have rendered the same verdict in the absence of the error. Defendant also contends it cannot be shown under *People v. Watson* (1956) 46 Cal.2d 818, 836, that there was a reasonable probability the error did not affect the verdict adversely to defendant. According to defendant, the trial court's errors were exacerbated by the prosecutor arguing to the jury that it could not consider Officer Baccari's training and experience nor whether alternative means were available to her, thus reducing the standard of reasonableness to a subjective one.

Defendant cites *Kopf v. Skyrm* (4th Cir. 1993) 993 F.2d 374 (*Kopf*) for the proposition that where a standard is not defined as that of a reasonable person, but rather that of a reasonable officer, there may be a need for the jury to be exposed to specialized knowledge. (*Id*. at p. 378.) In addition, defendant argues, one of the factors the jury may consider is the availability of alternative methods of dealing with a subject, and this question removes the subject away from the common knowledge of jurors. (See *Smith v. City of Hemet* (9th Cir. 2005) 394 F.3d 689, 703.)

We believe the trial court properly exercised its discretion in excluding certain evidence of Officer Baccari's training and experience. As noted, when a law enforcement officer is accused of using excessive force in the course of discharging his or her duties, we must analyze that claim against the Fourth Amendment's standard of objective reasonableness. (*Graham*, *supra*, 490 U.S. at p. 388.) Under this standard, and given the circumstances of this case, evidence of police procedures was not relevant. As the trial court pointed out, police policy is not the law. The procedures may state a higher or lower standard than that of a lawful, reasonable level of force. (See, e.g., *Garner*, *supra*, 471 U.S. at p. 5 [standard in police policy different from statute].) The conduct of a reasonable officer in a situation such as occurred here was clearly a question for the jury. Moreover, the circumstance of Officer Baccari's own training and experience would be relevant only to her subjective belief in the reasonableness of her use of force, and it is an objective standard that governs the issue. Therefore, the trial court did not

abuse its discretion when it ruled such evidence irrelevant and inadmissible. (See Evid. Code, § 350.)

The fact that CALCRIM No. 2670 states that the jury may consider evidence of the officer's training and experience in deciding whether the detention was lawful does not signify, as defendant argues, that the trial court's ruling was erroneous regarding the reasonableness of the officer's use of force. The lawfulness of the detention rests upon the reasonableness of the officer's suspicion that the detainee is or is about to be involved in activity related to crime. The jury had to decide whether the detention was lawful apart from any use of force, and sufficient inquiry into Officer Baccari's reasons for detaining defendant was permitted by the trial court. As the instruction states, special rules govern the use of force, and these "special rules" come into play during an otherwise lawful detention. The reasonableness of the use of force in the otherwise lawful detention is dependent upon, as *Graham* repeatedly emphasizes, the particular facts and circumstances confronting the officer. (*Graham*, *supra*, 490 U.S. at pp. 396-397.)

Here, defense counsel's questions that referred to training were always in connection to the use-of-force issue. For example, despite the trial court's ruling, counsel attempted to ask Officer Baccari if she was trained in officer safety and to remain in her patrol car if there is an "officer safety situation," if she was "trained to control individuals in situations such as this," if she was trained in dealing with homeless people, if she was trained in calming people down, and if she was trained that a baton could be used as a lethal weapon. Counsel also attempted to ask the officer if she was aware of the mental evaluation team (MET) in the city of Long Beach in order "to establish that there were nonviolent means of controlling the situation that she did not consider." The trial court found counsel had not established the MET was available at the pertinent time.

In addition, the court did allow defense counsel to ask if Officer Baccari had experience in calming people down, if she had dealt in the past with individuals who displayed unreasonable behavior, if in her experience yelling at a person who is yelling escalates the situation, and if she was trained to testify in court. Over the prosecutor's

17

objections, the trial court allowed defense counsel to ask Officer Baccari if there were other ways she could have controlled defendant. Illustrating that such training questions elicit subjective information, Officer Baccari replied, "I thought that [ordering defendant to his knees] would be the best way." Thus, the record shows that the court had a balanced approach to counsel's questions regarding training and experience and by no means imposed a blanket exclusion.

The court also found the probative value of the proposed evidence was substantially outweighed by the undue consumption of time its presentation would engender, and we believe it would also lead to confusion of the issues and misleading the jury.[4] A presentation of the Long Beach policies and procedures would require the prosecutor to rebut this evidence with evidence from several sources showing, inter alia, that the procedures were not universal and could not dictate the legal standard. As the trial court stated to defense counsel, the jury instruction (CALCRIM No. 2670) did not override the other rules of evidence or the trial court's rulings.

With respect to the expert, as defendant acknowledges, expert testimony is not required in order for a jury to determine if an officer used reasonable force. (*Allgoewer v. City of Tracy* (2012) 207 Cal.App.4th 755, 765-766 (*Allgoewer*).) In *Allgoewer*, the reviewing court held that the trial court had erred by *requiring* Allgoewer, in order to avoid a nonsuit, to offer expert testimony on the force a reasonable officer would have used under similar circumstances. (*Id*. at p. 757.) The defendants had argued to the court, just as defendant here, that without such "'expert testimony to establish an objective reasonableness standard for the defendant officers' actions, the lay jury will have no evidence from which to assess what actions are characteristic of a reasonable police officer.'" (*Id*. at p. 759.) The defendants contended the amount of force a

---

**4**      Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

18

reasonable officer would have used was not within the common knowledge of laypersons. (*Ibid*.)

The *Allgoewer* court stated that the need for expert testimony on this issue had not been addressed in any California case, and it relied on out-of-state authorities it found persuasive. (*Allgoewer*, *supra*, 207 Cal.App.4th at pp. 762-765.) Like defendant, the court cited *Kopf*. (*Allgoewer*, at p. 763.) The court noted *Kopf*'s holding that where the standard is defined by a reasonable officer rather than a reasonable person, the need for specialized knowledge rather than common knowledge is "more likely." (*Allgoewer*, at p. 763.) *Allgoewer* also noted, however, that *Kopf* held there is no blanket rule that such expert testimony is generally admissible or that it was not. (*Allgoewer*, at p. 763, citing *Kopf*, *supra*, 993 F.2d at pp. 378-379.) After reviewing other cases, the *Allgoewer* court concluded there was nothing about the particular use of force in Allgoewer's case that was so far removed from the comprehension of the jury that expert opinion testimony was required on the standard of conduct or on the amount of force that was reasonable under the circumstances of that case. (*Allgoewer*, at pp. 765-766.)

We reach the same conclusion in the instant case. Here, there was no showing of any type of force that was unfamiliar to a lay person. Furthermore, Kim was allowed to testify about tasers and batons—the weapons Officer Baccari used or attempted to use as either a weapon or a deterrent. In addition, as we have noted, defense counsel managed to pose several questions to Officer Baccari regarding alternatives she did not employ. Therefore, exclusion of the evidence did not abridge defendant's right to present a complete defense.

Finally, defendant argues that evidence of training and experience, law enforcement policies and procedures, and portions of Kim's testimony should not have been excluded under the test stated in *Perry v. Rushen* (9th Cir. 1983) 713 F.2d 1447 (*Perry*). In that case, the defendant complained that his right to compulsory process for obtaining witnesses in his favor under the Sixth and Fourteenth Amendments had been violated. The defendant wished to show that a third party committed the charged assault, and the trial court excluded, under Evidence Code section 352, the evidence of two

19

witnesses who had been robbed and raped by a different man in the same area. (*Perry*, at p. 1449.) *Perry* stated that in evaluating the significance of the evidence the trial court should consider all of the circumstances, i.e., the probative value, its reliability, whether it is capable of evaluation by the finder of fact, whether it is the sole evidence on the issue, and whether it constitutes a major part of the attempted defense. (*Id*. at pp. 1452-1453.) In *Perry*, however, the court stated that the excluded evidence was "of possible relevance." (*Id*. at p. 1453.) In the instant case, the proffered evidence of training was not relevant to the legal standard of excessive force. Assuming the proffered evidence had some relevance, however, we believe that, as in *Perry*, there was an absence of sufficient "probity of the evidence compared to its tendency to divert the trial and confuse the jury." (*Id*. at p. 1455.)

Having concluded that the trial court did not abuse its discretion under the ordinary rules of evidence, we also conclude there was no federal constitutional violation. "The general rule remains that '"the ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense. Courts retain . . . a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice."' [Citations.]" (*People v. Lawley* (2002) 27 Cal.4th 102, 155.) The United States Supreme Court has made it clear that the admission of repetitive, irrelevant, or marginally relevant evidence is not mandated by the Constitution. (*Crane v. Kentucky* (1986) 476 U.S. 683, 689-690.) "[T]he Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude [such] evidence . . . ." (*Id*. at pp. 689-690, quoting *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679.)

We conclude there was no error or constitutional violation occasioned by the trial court's exclusion of evidence regarding police procedures and Officer Baccari's training, or in its limitations on the expert testimony.

## III. *Pitchess* **Motion**

In defendant's opening brief, he requests this court to conduct an independent review of the reporter's transcript of the in camera *Pitchess* hearing for evidence of

officer dishonesty that was not turned over to the defense. The People have not objected to this court reviewing the transcripts of the hearing.

The trial court held a hearing for *Pitchess* discovery of any officer dishonesty or use of unreasonable force. We review a trial court's ruling on a *Pitchess* motion for abuse of discretion. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1220-1221.) That discretion is broad. (*People v. Samayoa* (1997) 15 Cal.4th 795, 827.) We conducted a review of the in camera proceedings in the manner contemplated by the decision in *People v. Mooc* (2001) 26 Cal.4th 1216, 1228-1230, and found the record to be adequate to permit meaningful appellate review. (See *People v. Prince* (2007) 40 Cal.4th 1179, 1285-1286.)

We have independently determined from the entire record and that of the sealed in camera proceedings that the trial court properly exercised its discretion and that no additional materials were erroneously not ordered disclosed to the defense.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.

21