Filed 1/23/23  Starks v. County of Los Angeles CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| MARY STARKS,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>COUNTY OF LOS ANGELES et al.,<br><br>Defendants and Respondents. | B312878<br><br>(Los Angeles County<br>Super. Ct. No.<br>19STCV38462) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kristin S. Escalante and Maurice A. Leiter, Judges.  Affirmed.

Law Offices of Dale K. Galipo, Dale K. Galipo and Marcel F. Sincich for Plaintiff and Appellant.

Hurrell Cantrall, Thomas C. Hurrell and Melinda Cantrall for Defendants and Respondents.

_____

An innocent bystander, 65-year-old Rickie Starks, died in crossfire between fleeing suspects and sheriff's deputies during a car pursuit. Appellant Mary Starks sued respondents County of Los Angeles and its deputies for causing her son's death. She alleges that the deputies caused the tragedy by unreasonably using deadly force.

The trial court entered summary judgment for respondents. (Code Civ. Proc., § 437c.) We conclude that respondents are entitled to summary judgment as a matter of law. It is undisputed that the suspects repeatedly fired an assault weapon at the deputies, striking their patrol car. In fear for their lives, the deputies fired back. It is unclear if the bullet that struck Mr. Starks was fired by the suspects or by the deputies. Assuming, arguendo, that the deputies struck Mr. Starks, no evidence shows they targeted him: They fired at the suspects, who they objectively, reasonably believed were trying to kill them. The deputies were not required to stand down or issue warnings. We affirm the judgment for respondents.

**FACTS**

At 11:20 p.m. on July 3, 2019, Los Angeles County Sheriff's deputies Edwin Barajas and Taylor Ingersoll (the deputies) were driving an arrestee to a detention facility in their patrol car. The deputies saw a black Cadillac Escalade run red lights and stop signs. They activated their emergency lights and attempted a traffic stop. The driver did not yield. Ingersoll radioed that they were pursuing a reckless drunk driver. Barajas recalled that the same type of car was involved in a shooting in that neighborhood, one day earlier.

The deputies pursued the Escalade through a residential neighborhood. They heard popping, firework-like sounds. Then

they heard gunshots from a high-power weapon and saw muzzle flashes in their direction. They radioed that they were "taking rounds," as bullets struck their car. Barajas slowed down, but muzzle fire kept coming from the Escalade as it turned north on Aranbe Avenue in Compton. Ingersoll saw a passenger hanging out of the window, shooting what appeared to be a rifle at the patrol car; he heard rapid-fire rounds "whizzing past us and striking our vehicle." The deputies ducked down, making themselves small to avoid being hit. They feared for their lives, for the arrestee in their car, and the public. Appellant does not dispute that someone in the Escalade shot at the deputies.

It is undisputed that the deputies fired nine-millimeter rounds at the Escalade through the windshield of their patrol car. They were unaware that the Escalade was retrofitted with ballistic armor and was bulletproof. The patrol car carried an AR-style rifle between the front seats, but the deputies did not use it.

Anthony Hennessy was in the backseat of the patrol car. Hennessy declared that people in the Escalade fired guns at the deputies first; the deputies returned fire but did not initiate it.

Deputy Ingersoll said they were three or four car lengths behind the Escalade. He described having "tunnel vision" and was struggling with the radio. The deputies declared that they did not see or aim at Mr. Starks, who was riding his bicycle on Aranbe Avenue. Barajas testified that he fired solely at their target, the Escalade. His lights and siren were on the entire time.

It is undisputed that Mr. Starks was "in the direct line of fire of the gun-battle." The deputies' car was mechanically disabled and came to a stop after being hit 30 times by bullets.

Ingersoll's hand was injured by shrapnel and he sustained a burn abrasion on his shoulder during the shootout. He did not learn that Mr. Starks was shot until later.

A second patrol car, carrying Deputies Cuevas and Benzor, joined the chase. They saw the Escalade turn onto Aranbe Avenue while firing repeatedly at Barajas and Ingersoll. Cuevas stated that people in the Escalade fired at him; muzzle flashes came from the SUV and rounds struck the pavement in front of him. The Escalade abruptly turned and drove directly at Cuevas, who could see a "barrel hanging out, like a muzzle from a rifle." Fearful of getting shot, Cuevas bailed out of his patrol car and fired his weapon at the Escalade as it passed. Appellant does not dispute that the suspects shot at Cuevas.

A sheriff's helicopter pursued the Escalade. A deputy on board saw the SUV travelling at 100 to 120 miles per hour on surface streets, running red lights. Someone in the Escalade fired four or five gunshots at the helicopter. It is undisputed that the Escalade eventually stopped and the driver, gang member James Harris, was arrested. The fingerprints of Hayden Taylor, another gang member, were found on the rear passenger window. An investigation showed that Taylor was firing at the deputies.

Paramedics were dispatched at 11:28 p.m. and arrived in four minutes. They found Mr. Starks facedown by his bicycle on Aranbe, just west of Spruce, with his upper body under a parked Scion. They pulled him from under the car and turned him over to render aid, but he showed no signs of life. He was pronounced dead at the scene. The cause was a gunshot wound to his chest.

Cartridge cases for 7.62 x 39-millimeter bullets were found: One was under the tire of Mr. Starks' bicycle; 12 more were on Aranbe Avenue; more were on Spruce, where the Escalade

4

traveled before turning onto Aranbe; and one was on Oleander Avenue, where the Escalade traveled before turning onto Spruce. The same size cartridge was found in the Escalade, along with a hidden compartment containing guns and ammunition.

Officers recovered a 21.5-inch-long Draco AK-47 type rifle or pistol along the route taken by the Escalade.[1] The chamber and 30-round magazine were empty. The weapon uses 7.62 x 39-millimeter bullets. Appellant's expert agreed that the deputies "were within the range of the suspect in the Escalade [who] was firing the AK-47 pistol." He testified that seven or eight bullets were fired from the Escalade when the deputies were at the intersection of Spruce and Aranbe. Eleven bullets from the deputies' nine-millimeter guns struck the Escalade. No nine-millimeter bullets or fragments were found beyond Mr. Starks's body on Aranbe.

The coroner's office performed an autopsy. The examiner found a through-and-through gunshot wound that lacerated Mr. Starks's organs. The wounds to his lungs, heart and liver were "rapidly fatal." The examiner concluded, to a reasonable medical probability, that "[t]he injuries are consistent with a high-powered rifle." The wound is "atypical," suggesting that the bullet hit an intermediate target or ricocheted. In his deposition, the examiner could not rule out that the bullet was from a nine-millimeter gun, not from an assault weapon.

Respondents' law enforcement expert opined that the deputies had probable cause to conduct a traffic stop of the

---

[1] Suspect Hayden Taylor described the Draco as "[a] mini AK-47." In a recorded conversation, he said he fired it 40 times at the deputies because he did not want to go back to jail. The Draco is classified as an assault weapon.

5

Escalade after seeing it run red lights, posing a risk to public safety. The deputies properly pursued the Escalade when the driver failed to yield. When the deputies saw muzzle flashes in their direction, they radioed that they were taking rounds. Surveillance video showed that shots were fired from the Escalade. The expert opined that the deputies fired back because they reasonably believed they faced imminent death or serious bodily injury. They had no other alternative.

Appellant's forensic pathologist reviewed the autopsy report and photographs. He opined in a declaration that Mr. Starks's fatal wound was "consistent with a high velocity rifle bullet; or a handgun bullet, including a 9 mm caliber bullet, that suffered an external ricochet, [and] developed a high yaw before striking the Decedent's body." In his deposition, appellant's medical expert opined that the victim was struck by a 9-millimeter bullet fired by the deputies through glass or ricocheting off the ground, in a northerly direction. He deemed it unlikely that the fatal bullet was fired from the Escalade, which was shooting southward at the deputies, given the trajectory of the bullet through Mr. Starks.

Appellant's law enforcement expert was not trained in California, nor did he serve here. He opined that the deputies were at fault. They did not report the license plate of the Escalade after seeing it run two red lights; this suggests that there was no reason to initiate a traffic stop. There was no reason for the deputies to fire their weapons when they only thought they heard fireworks. Bullets fired by the deputies killed Mr. Starks, given the position of his body and the trajectory of his bullet wound. It was inappropriate to shoot indiscriminately through a windshield at a moving vehicle or use deadly force on

6

an innocent bystander.  They should have ended the pursuit, not escalated it.

At his deposition, appellant's expert did not believe the deputies intentionally shot Mr. Starks, saying, "I've seen nothing to indicate that they shot him on purpose."[2]  Though he was not at the scene of the shooting, he opined that the deputies fired first, yet agreed that percipient witnesses, including the deputies' prisoner, said the first shots were fired from the Escalade.  He agreed that the deputies radioed that they were pursuing a reckless drunk driver and that the deputies had a reasonable suspicion to stop the Escalade if they saw it run red lights and a stop sign; it is not prohibited (but is unwise) to do so while transporting a prisoner.  The expert lacks certification in gunshot wounds and agreed that he is not qualified to give a medical opinion.  He opined that the deputies should not have attempted to conduct the traffic stop, even if the Escalade ran red lights.

In listening to and watching a recording of the shooting, appellant's expert heard one shot from the Escalade while it was traveling on Spruce, then eight more shots as it turned right on Aranbe.  He saw six or seven muzzle flashes from the Escalade. He did not see muzzle flashes from the patrol car.  Mr. Starks was found near the intersection of Spruce and Aranbe.  The expert agreed that issuing a warning to the shooter firing an AK-47 would not have had any effect.

Appellant was born in 1927.  Her son, Mr. Starks, lived with her full time.  He used a bicycle for transportation.  The last

---

[2] Both appellant's expert and respondents' investigator found no evidence suggesting that the deputies purposely shot Mr. Starks.

time she saw him was the night of July 3, 2019, when he said he was going to the store and asked if she needed anything. The next day, police told her he had been killed. She almost fainted. She did not personally witness the shooting or know if the deputies are responsible.

Hayden Taylor and others were charged with the murder of Mr. Starks; attempted murder of Deputies Barajas, Ingersoll, Cuevas, and Benzor; attempted murder of Anthony Hennessy; assault with a deadly weapon; shooting from a motor vehicle; fleeing a peace officer while driving recklessly; possession of a firearm by a felon; and possession of an assault weapon. We have taken judicial notice that Deven Littlejohn pleaded no contest to assault with a machine gun or assault weapon on Deputy Barajas.

## PROCEDURAL HISTORY

Appellant filed suit against respondents for battery, negligence, and violation of the Tom Bane Civil Rights Act (Civ. Code, § 52.1). Respondents cross-complained against the suspects and the owner of the Escalade: Hayden Taylor, Deven Littlejohn, James Earl Harris III, Traveon McCowen, and Keenon Jackson.

The court denied respondents' motion for judgment on the pleadings. Respondents moved for summary judgment. They argued that they are entitled to judgment as a matter of law because the deputies' use of force in self-defense was objectively reasonable and the evidence does not show that they intentionally or accidently used deadly force against Mr. Starks. Appellant opposed the motion.

8

## THE TRIAL COURT'S RULING

The court granted summary judgment, concluding that the deputies' use of force was reasonable. They attempted to stop a reckless, inebriated driver from committing traffic offenses. The suspects evaded arrest and shot at the deputies with an assault weapon, striking the patrol car and Ingersoll. There is no dispute that the deputies heard gunshots or that the suspects in fact shot at the patrol car. The suspects' use of deadly force gave the deputies a reasonable belief that they should respond with deadly force to avert an immediate threat to the safety of themselves and others. They did not have to give warnings or wait for air support to take over the pursuit. The deputies' use of force was objectively reasonable as a matter of law. The court did not decide who shot Mr. Starks. It entered judgment for respondents and denied appellant's motion for reconsideration.

## DISCUSSION

### 1.    Appeal and Review

Summary judgment allows courts "to cut through the parties' pleadings . . . to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*); *Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 542.) It is appropriate when no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) The judgment is appealable. (*Id.*, subd. (m)(1).)

"On summary judgment, the moving party's burden is more properly labeled as one of *persuasion* rather than *proof*. That is because, in order to carry such burden, he must *persuade* the court that there is no material fact for a reasonable trier of fact to

9

find, and not *prove* any such fact to the satisfaction of the court itself as though it were sitting as the trier of fact." (*Aguilar, supra,* 25 Cal.4th at p. 845, fn. 4.)

We "independently examine the record to determine whether triable issues of material fact exist." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767.) "Evidence presented in opposition to summary judgment is liberally construed, with any doubts about the evidence resolved in favor of the party opposing the motion." (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618.)

## 2. Unpleaded Claims

The trial court wrote, "In opposition to this motion Plaintiff for the first time offers a theory that [the deputies] engaged in the shooting so they could be admitted into an alleged Deputies gang called the Executioners. . . . This is beyond the pleadings and the Court does not consider it." We agree. The complaint alleges that the deputies shot at the suspects and at Mr. Starks during a vehicle pursuit while attempting to make a traffic stop; Mr. Starks died because the deputies used deadly force to stop the suspects. It does not allege that the deputies randomly targeted an unarmed bicyclist to gain peer approval.

Summary judgment allows a defendant " 'to show that material factual claims arising from the pleadings need not be tried because they are not in dispute.' " (*FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 381 [witness declarations show if there are any triable issues of fact, as delimited by the pleadings]; *White v. Smule, Inc.* (2022) 75 Cal.App.5th 346, 354 [pleading determines scope of summary judgment motion].) The motion must negate " ' "theories of liability *as alleged in the complaint*" ' " and need not " ' " ' "refute liability on some

10

theoretical possibility not included in the pleadings," ' " ' simply because such a claim was raised in plaintiff's declaration in opposition to the motion for summary judgment." (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1254.)

The pleading did not put respondents on notice of a claim that the deputies shot Mr. Starks because they wished to join a sheriff's department gang. Similarly, appellant's claim that the deputies refused medical care to Mr. Starks is not pleaded. The record shows that paramedics arrived within minutes, but Mr. Starks succumbed to "rapidly fatal" wounds to his organs.

It is true that "we generally construe the pleading broadly [citation]; but the pleading must allege the essential facts " ' " 'with reasonable precision and with particularity sufficient to acquaint a defendant with the nature, source and extent of [the] cause of action.' " ' " (*Soria v. Univision Radio Los Angeles, Inc.* (2016) 5 Cal.App.5th 570, 585 [plaintiff cannot raise new issues while opposing summary judgment].) Appellant is bound by the rule that " '[a] party may not oppose a summary judgment motion based on a claim, theory, or defense that is not alleged in the pleadings,' " which makes her belated claims that the deputies were "chasing ink" or failed to provide aid " 'irrelevant.' " (*Jacobs v. Coldwell Banker Residential Brokerage Co.* (2017) 14 Cal.App.5th 438, 444.)

3. **Intentional Shooting Claim**

Appellant alleged that the deputies intentionally shot Mr. Starks. The trial court's statement of decision did not address the issue of intent; however, our review is de novo and hence we may address it for the first time on appeal. Any failure to give all reasons for granting summary judgment "presents no harm where, as here, our independent review establishes the validity of

11

the judgment." (*Soto v. State of California* (1997) 56 Cal.App.4th 196, 199.)

Appellant's claim of an intentional shooting is belied by the record. Appellant's expert testified, "I don't believe [the deputies] intended to shoot Mr. Starks. . . . [It] was an accidental shooting as they were shooting at the Escalade." Respondents' expert similarly found no clues suggesting that the deputies shot Mr. Starks on purpose.

Appellant theorizes that while the deputies chased the Escalade—in the chaos of the shoot-out—they both formed a belief that (a) the people in the Escalade were Black; (b) Mr. Starks jumped from the Escalade; and (c) they should intentionally target Mr. Starks, an innocent Black man, as someone from the Escalade who posed a threat to them.

Appellant's argument is unsupported by the record. There is no evidence that the deputies saw who was in the Escalade, which was in front of them, at night. It is speculation that the deputies knew the suspects were Black. It defies reality to argue that in the three to five seconds that the deputies paused at the intersection of Spruce and Aranbe, they formed a belief that Mr. Starks jumped from the Escalade with a bicycle, mounted the bicycle, and began to ride down the street, so they should target him because he is Black. No reasonable trier of fact could find for appellant on this issue. (*Aguilar, supra,* 25 Cal.4th at p. 856 [court must determine what any evidence submitted by the plaintiff "*could show or imply to a reasonable trier of fact*"].)

4.   **Dispute as to Who Shot Mr. Starks**

Appellant's battery claim requires a showing that the deputies intentionally fired their weapons, hitting Mr. Starks; her negligence claim requires a showing that they failed to

12

exercise reasonable care.  Respondents assert that they are not liable because the deputies did not shoot Mr. Starks, who was struck by a bullet fired from the Escalade.  Appellant contends that a triable issue is presented as to who shot Mr. Starks.

The parties offered conflicting evidence on this point.  The coroner's examiner wrote that "[t]he injuries are consistent with a high-powered rifle" but could not rule out that a nine-millimeter bullet hit an intermediate target or ricocheted.  Appellant's expert declared that the injury is "consistent with a high velocity rifle bullet; or a handgun bullet, including a 9 mm caliber bullet that suffered an external ricochet [and] developed a high yaw before striking the Decedent's body."  At deposition, appellant's expert opined that the victim was struck by a bullet fired by the deputies through glass or ricocheting off the ground.

A trier of fact could determine that Mr. Starks was struck by the suspects' assault weapon, or by one of the deputies' weapons.  As we shall see, this dispute of fact is not material.  The dispositive question is whether the deputies reasonably used deadly force.

5.    **Reasonable Use of Deadly Force**

The parties focus on whether the deputies reasonably used deadly force, given the totality of the circumstances.  Their intent to target a fleeing suspect may form the basis of a lawsuit by an injured bystander who was not the deputies' intended target.  (*Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 526–527, fn. 10 (*Brown*) [officers owe bystanders a duty to use reasonable force].)  To prevail, appellant must show the deputies acted unreasonably.  Appellant's claims fail if the deputies' use of force was reasonable, or if they acted in self-defense, under a "transferred intent" theory.  (*Ibid.*)

" ' " 'Unlike private citizens, police officers act under color of law to protect the public interest.' " ' " (*Lopez v. City of Los Angeles* (2011) 196 Cal.App.4th 675, 685).) While attempting an arrest, officers "need not retreat or desist from their efforts by reason of the resistance or threatened resistance of the person being arrested." (Pen. Code, § 835a, subd. (d); *Lopez*, at p. 685.) They need not " ' "choose the "most reasonable" action or the conduct that is the least likely to cause harm' " when apprehending a violent suspect. (*Hayes v. County of San Diego* (2013) 57 Cal.4th 622, 632 (*Hayes*).)

"[T]he decision by a peace officer to use force shall be evaluated from the perspective of a reasonable officer in the same situation, based on the totality of the circumstances known to or perceived by the officer at the time, rather than with the benefit of hindsight, and that the totality of the circumstances shall account for occasions when officers may be forced to make quick judgments about using force." (Pen. Code, § 835a, subd. (a)(4); *Graham v. Connor* (1989) 490 U.S. 386, 396–397 (*Graham*); *Hayes, supra,* 57 Cal.4th at p. 632; *Brown, supra,* 171 Cal.App.4th at p. 526.)

The Legislature has defined when officers may justifiably use deadly force, including the discharge of a firearm. (Pen. Code, § 835a, subd. (e)(1).) An officer "is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary for either of the following reasons: [¶] (A) To defend against an imminent threat of death or serious bodily injury to the officer or to another person. [¶] (B) To apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the

person will cause death or serious bodily injury to another unless immediately apprehended.  Where feasible, a peace officer shall, prior to the use of force, make reasonable efforts to identify themselves as a peace officer and to warn that deadly force may be used, unless the officer has objectively reasonable grounds to believe the person is aware of those facts."  (*Id.,* subd. (c)(1).)  The sheriff's department manual forbids firing a gun at a vehicle " 'unless a person in the vehicle is imminently threatening a [deputy] or another person present with deadly force by means other than the moving vehicle.' "

"A threat of death or serious bodily injury is 'imminent' when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person.  An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed."  (Pen. Code, § 835a, subd. (e)(2).)

The federal standard states that use of deadly force depends on (1) the severity of the crime, (2) the immediate threat to the officers or others, (3) whether a suspect is resisting arrest or attempting to evade arrest by flight, and (4) the officers' tactical conduct and decisions before using deadly force. (*Graham, supra,* 490 U.S. at p. 396; *Hayes, supra,* 57 Cal.4th at pp. 626, 637–638.)  It is constitutional to use deadly force if there is probable cause to believe an armed suspect poses a threat of serious harm.  (*Tennessee v. Garner* (1985) 471 U.S. 1, 11–12.)

15

Appellant does not disagree with the legal standards for assessing an officer's use of deadly force. Her argument is factual. She contends that there is a dispute as to whether (1) the deputies created the dangerous situation; (2) the suspects posed an immediate threat of death or serious bodily injury at the time the deputies shot Starks; (3) the deputies could have used "reasonable alternatives"; (4) they put innocent lives at risk; and (5) they violated department policy and training. None of these points presents a triable issue, given the undisputed facts.

The totality of the circumstances, from the point of view of the deputies, shows that their use of deadly force was justified as a matter of law. Appellant *does not dispute* that (a) people in the Escalade shot at the deputies; (b) bullets struck and disabled their patrol car; (c) bullet casings from an AK-type firearm were found on Oleander, Spruce, and Aranbe, and one was under the tire of Mr. Starks's bicycle; and (d) the suspects fired at deputies in a second patrol car and at a sheriff's helicopter.

There is no triable issue on the reasonableness of the deputies' belief that there was an imminent threat of death or serious bodily injury. The deputies testified that they feared for their lives. Appellant's own law enforcement expert opined that the deputies had an objectively reasonable belief that people in the Escalade "were trying to kill them," adding, "I don't believe any reasonable officer would think otherwise." There were bullet holes in their car and Ingersoll was struck by shrapnel. Appellant's expert agreed that "officers are entitled to use deadly force when faced with an objectively reasonable imminent threat of death or serious bodily harm" and someone firing an assault weapon "is a lethal threat" to the deputies, their passenger, and anyone nearby.

16

The law does not require the deputies to stand down when they see a reckless driver—believed to be under the influence—endangering the public by running red lights. Nor must they desist from arresting someone who is shooting at them. The threat of death or great bodily harm had to be instantly confronted and addressed. An officer faced with an armed suspect need not " 'hold fire in order to ascertain whether the suspect will, in fact, injure or murder the officer.' " (*Martinez v. County of Los Angeles* (1996) 47 Cal.App.4th 334, 345; *Villalobos v. City of Santa Maria* (2022) 85 Cal.App.5th 383, 389.)

The suspects' willingness to fire wildly from a speeding vehicle in a residential neighborhood posed a severe threat. Appellant's expert agreed that the shooter had no regard for the safety of residents, the deputies, or anyone in the deputies' car. "[I]f police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." (*Plumhoff v. Rickard* (2014) 572 U.S. 765, 777.) They need not delay the arrest or withdraw to avoid conflict. (*Hernandez v. City of Pomona* (2009) 46 Cal.4th 501, 518.)

Contrary to appellant's claim, officers are not "responsible to justify every shot" when faced with a hailstorm of bullets from an assault weapon. They may shoot at a moving vehicle to neutralize the imminent threat posed by a suspect shooting at them indiscriminately with an assault weapon while fleeing arrest. (*Koussaya v. City of Stockton* (2020) 54 Cal.App.5th 909, 936–938 (*Koussaya*).)

Appellant cites *Zion v. County of Orange* (9th Cir. 2017) 874 F.3d 1072 to support her argument that the deputies faced no immediate threat when they fired their guns. In *Zion*, a suspect

17

stabbed an officer but fell and curled up on the ground when he was shot at nine times. An officer approached the prone suspect, fired nine more bullets at close range and stomped on the suspect's head three times. (*Id.* at p. 1075.) A jury could find that excessive force was deployed because the suspect posed no risk after falling to the ground. (*Id.* at pp. 1076–1077.) *Zion* is distinguishable. The suspects in the Escalade were not prone on the ground: They were firing an assault weapon at the deputies, posing an immediate and ongoing threat.

The facts of this appeal are akin to those in *Brown, supra,* 171 Cal.App.4th 516, where an innocent bystander was injured when police fired 33 or 34 rounds at a suspect who was trying to run them over. Summary judgment was properly granted in *Brown* on the plaintiff's negligence and battery claims because the use of deadly force was objectively reasonable when the suspect was trying to harm or kill the officers. (*Id.* at pp. 520–523, 528, 536.) The same reasoning applies here.

No evidence supports appellant's claim that the deputies "initiated the gun-battle without provocation" by firing first. Eyewitnesses (the deputies and their passenger) said a shooter in the Escalade fired first. The opinion of appellant's expert (who was not a percipient witness) that the deputies fired first is contradicted by eyewitnesses and a surveillance tape. Cartridges from the assault weapon found on three streets show that numerous bullets were fired, striking the patrol car, before the deputies returned fire.

Appellant argues that the deputies should have given warnings to deescalate the situation or awaited backup instead of opening fire. The deputies admittedly did not give verbal warnings. Barajas testified that it was impractical to do so

18

during the tense and rapidly evolving pursuit. The record shows that the deputies had air and ground backup; however, the suspects fired at the second patrol car and at the helicopter, underscoring the importance of trying to stop the Escalade as quickly as possible. (See *Koussaya, supra,* 54 Cal.App.5th at p. 941 [rejecting a claim that officers should not have followed a fleeing suspect's car closely, drawing fire, when they knew an air unit was tracking the chase].)

The suspects knew the deputies were trying to pull them over, using a siren and flashing lights. Instead of complying, they opened fire on the deputies. "Verbal warnings are not feasible when lives are in immediate danger and every second matters." (*Estate of Martinez v. City of Federal Way* (9th Cir. 2004) 105 F.Appx. 897, 899.) Appellant's expert agreed it was useless to issue a warning while someone was shooting at the deputies from a moving vehicle. He conceded that less lethal options (taser, pepper spray, baton, bean bags) would be ineffective against a suspect firing an AK-47. It is unavailing to argue that the deputies could have responded differently—with the benefit of hindsight—given the immediacy of the suspects' deadly assault. (*Brown, supra,* 171 Cal.App.4th at p. 537.)

Our conclusion that the deputies reasonably used deadly force bars appellant's claims.[3] The underlying basis for the

---

[3] Appellant cannot maintain a cause of action under the Tom Bane Civil Rights Act (Civ. Code, § 52.1), which gives "a *personal* cause of action for the victim of a hate crime" and does not apply to wrongful death claims. (*Bay Area Rapid Transit Dist. v. Superior Court* (1995) 38 Cal.App.4th 141, 144; *City of Simi Valley v. Superior Court* (2003) 111 Cal.App.4th 1077, 1085.)

claims is that the deputies used unreasonable deadly force by shooting at a car. (*Koussaya, supra,* 54 Cal.App.5th at p. 932.) The totality of the circumstances belies appellant's claims. There are no triable issues as to any material fact.

## DISPOSITION

The judgment is affirmed. Respondents are entitled to recover their costs on appeal.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


CHAVEZ, J.


HOFFSTADT, J.