Filed 4/20/26  McMurtry v. Cal. Highway Patrol CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| ANN MCMURTRY et al., | D087165 |
| Plaintiffs and Appellants, | (Super. Ct. No. CIVSB2121497) |
| v. | |
| CALIFORNIA HIGHWAY PATROL, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Gilbert G. Ochoa, Judge.  Reversed and remanded with directions.

Glickman & Glickman, Steven C. Glickman, Nicole E. Hoikka; The Sweeney Firm, and John E. Sweeney for Plaintiffs and Appellants.

Rob Bonta, Attorney General, Iveta Ovsepyan, Assistant Attorney General, Donna M. Dean, Stephanie A. Vollmer, and Elizabeth MacKinnon, Deputy Attorneys General, for Defendant and Respondent.

This case arises from a police shooting that resulted in the death of Charley McMurtry.  McMurtry's wife and minor child (through his guardian ad litem) filed suit against the California Highway Patrol (CHP), which employed the officers involved in the shooting, alleging claims for wrongful

death, assault, battery, negligence, false arrest, violation of the Bane Act, and violation of the Unruh Act. The trial court granted the CHP's motion for summary judgment, concluding as a matter of law that the killing of McMurtry was reasonable and that no juror could conclude otherwise.

On appeal from the subsequent judgment entered by the trial court against them, the plaintiffs assert the court erred by granting the motion because it focused too narrowly on the seconds that proceeded the fatal shooting, rather than considering the totality of circumstances that led to McMurtry's death. Appellants contend that under this framework, triable issues of material fact remain concerning the reasonableness of the CHP officers' conduct and the case should proceed to a jury. For the reasons set forth herein, we agree with appellants and reverse the trial court's decision granting the CHP's motion for summary judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In the afternoon on February 5, 2021, McMurtry's wife, Ann, was driving on Interstate 10 with McMurtry in the passenger seat of her car. McMurtry suffered from Post-Traumatic Stress Disorder (PTSD) and was a veteran of the United States Marine Corps. He had been recently hospitalized as a result of two suicide attempts. As they drove to pick up a relative from work, McMurtry began to talk about his military experiences. He was agitated and Ann offered to drive him to a veteran's center where he was registered for mental health counseling.

McMurtry then told Ann he loved her, suddenly pulled out a knife, and cut his wrists and throat. The knife "looked like a little paring knife," and was two to three inches in total length. Ann began to pull her car to the shoulder of the freeway. Before she could come to a complete stop, McMurtry

2

jumped out of the car. Ann immediately called 911 and explained the situation. The incident report for the case shows Ann called 911 at 2:46 p.m.

Three CHP officers responded to the call, which was announced on their dispatch radios: James Farner, Jesus Garcia, and Michael Migliacci. Farner heard the dispatcher state there was "an involved party in a brown Jeep" advising that her husband "just came out of the hospital for a 5150 hold." The dispatcher reported the man was "a retired Marine and was having trouble with PTSD." Farner heard the dispatcher say McMurtry had "jumped out of the vehicle, is hiding behind a tree on the right-hand shoulder, and he cut his wrist." A few minutes later, the dispatcher stated there was "a report of a pedestrian [on] westbound 10 west of Euclid … carrying a knife." Farner also heard dispatch state the "missing man 'sliced his throat, and he has been stabbing himself.' "

As the responding officers continued looking for McMurtry, Farner and Garcia encountered each other on the freeway as they searched on foot. When dispatch reported Ann was at a nearby fast food restaurant, Garcia drove there to speak with Ann. Migliacci arrived there shortly after. During this interaction, the police dispatcher reported McMurtry was on the freeway near the restaurant. The officers immediately left the restaurant in their separate patrol cars and drove towards McMurtry's location.[1] Farner, who heard the same report, entered the freeway just in front of Garcia and Migliacci in his own patrol car. Garcia testified at his deposition that

---

[1] Another police officer from the Upland Police Department also met with Ann at the restaurant and drove his own police vehicle to McMurtry after dispatch reported his location.

McMurtry was walking near the median of the eastbound freeway about a half mile from the entrance the three patrol cars used to reach him.

There was heavy traffic on the freeway, which had come to a standstill on both sides because of McMurtry. Farner reached McMurtry at approximately 3:25 p.m. The minute before Farner arrived at the scene, he heard the dispatcher report that McMurtry was " 'last reported in and out of the center divider and in the traffic lanes now but he was trying to open car doors.' " The incident report shows a similar statement by dispatch at 3:24 p.m. When Farner reached McMurtry, he was standing near the center median holding the knife. Migliacci estimated it took the officers four minutes to reach McMurtry's location. When Farner reached the scene, he stopped his car in the third lane from the center, 30-40 feet from McMurtry. Farner immediately got out of his car, closed the door, and walked toward McMurtry with his gun drawn and pointed at McMurtry.

A person in a car stopped behind Farner's patrol car, Francisco Galvez, began recording the interaction with his phone after Farner pointed his weapon at McMurtry. In the video, McMurtry is seen walking from the center divider with his left arm raised holding the knife towards Farner, who is behind his patrol car. McMurtry then walks around Farner's patrol car clockwise from the front driver's side to the rear passenger side. When he reaches the back of the car, McMurtry begins to run towards Farner. Farner backs up, and both men are on the driver side of the patrol car but are obscured in the video by a Range Rover between the patrol car and Galvez's car. Farner fires three shots, audible on the video, as the men come back into the camera's view. McMurtry immediately falls to the ground, making no further movement.

4

When Migliacci arrived seconds after Farner, he stopped his patrol car four or five cars behind Farner's car, got out of his car with his taser in his hand, and ran towards the scene. He is visible in the video of the shooting in the side-view mirror of Galvez's car, running towards Farner and holding the taser in both hands. Migliacci testified at his deposition that Farner fired his gun, killing McMurtry, within ten seconds of Migliacci's arrival. Garcia was also close behind Farner and testified that as he arrived at the scene he reported over his radio that he had "less lethal" force in his vehicle, a beanbag shotgun.

In support of their opposition to the motion for summary judgment, plaintiffs provided excerpted deposition testimony of another witness to the shooting, Alisa Goodly. She testified that when her car arrived at the scene, two police vehicles were slowing traffic to a stop. Goodly saw three or four police officers outside their vehicles on the eastbound side of the freeway, the same side on which she was traveling. Goodly saw McMurtry walking down the median in the opposite direction of the traffic. She also saw two police officers on the westbound side of the freeway. Goodly estimated the officers she saw on the eastbound side were about three car lengths from McMurtry. Goodly saw McMurtry was holding a knife and then noticed Farner standing with his gun drawn, pointing it at McMurtry, in the farthest right lane of the freeway from the median. Within a minute of seeing Farner, Goodly saw him shoot, killing McMurtry.

In July 2021, Ann and the minor son she shared with McMurtry, by and through her son's guardian ad litem, filed the underlying lawsuit against the CHP and unnamed Doe defendants. The complaint alleged state law causes of action for wrongful death, assault, battery, negligence, false arrest and imprisonment, violation of the Bane Act, and violation of the Unruh Act.

5

In May 2024, the CHP moved for summary judgment, asserting each cause of action failed because Farner's shooting of McMurtry was justified and, thus, no civil liability attached. The CHP also sought summary adjudication of plaintiffs' Unruh Act claim.

The plaintiffs opposed the summary judgment motion, contending triable issues of fact existed as to whether Farner's conduct leading to the shooting was reasonable. In their opposition, plaintiffs conceded that Farner acted reasonably in the final seconds before the shooting as McMurtry charged towards him. However, the plaintiffs argued Farner's use of deadly force only became necessary as a result of his preceding conduct and that triable issues of material fact remained as to whether that conduct was reasonable. In support of their opposition, the plaintiffs submitted the declaration of Roger Clark, an expert in policing techniques. Clark opined that Farner's conduct was not reasonable as a matter of law because he rushed to confront McMurtry, who was known to be suffering from a mental health crisis, rather than devise a plan with the other responding law enforcement officers to take McMurtry safely into custody.

After a hearing, the trial court granted the CHP's motion for summary judgment, finding the use of deadly force by Farner was reasonable as a matter of law and the CHP is not a business establishment for purposes of liability under the Unruh Act.[2] The trial court also sustained several of the CHP's evidentiary objections to Clark's declaration. Thereafter, the trial court entered judgment in favor of the CHP and the plaintiffs timely appealed.

---

[2] Appellants do not challenge the dismissal of their Unruh Act claim.

6

DISCUSSION

Appellants assert the trial court erred by finding that no triable issues of material fact remain with respect to whether the CHP officers' conduct leading to Farner's shooting of McMurtry was reasonable.  In addition, they contend the court's evidentiary rulings were in error.  The CHP responds that the trial court correctly concluded no triable issues of material fact remain and that the officers' pre-shooting conduct cannot form the basis for an otherwise reasonable shooting.  The CHP also asserts the court's evidentiary rulings were not an abuse of discretion.

I

*Standard of Review*

We review the trial court's order granting a motion for summary judgment de novo, "considering all of the evidence offered in connection with the motion—except that which the court properly excluded—and the uncontradicted inferences the evidence reasonably supports." (*DiCola v. White Bros. Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 674–675.)  In our independent review of the evidence, we assume the role of the trial court and apply the same rules and standards that govern a trial court's determination of a motion for summary judgment.  (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694; *Riverside County Community Facilities Dist. v. Bainbridge 17* (1999) 77 Cal.App.4th 644, 652.)

"Summary judgment is granted when a moving party establishes the right to the entry of judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c).)  A 'party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law.' (*Aguilar v. Atlantic Richfield, Co.* (2001) 25 Cal.4th 826, 850.)  Once the moving party meets this initial burden,

7

the burden then shifts to the party opposing summary judgment to establish, by means of competent and admissible evidence, that a triable issue of material fact still remains." (*Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 525 (*Brown*).)

" 'An issue of fact can only be created by a conflict of evidence. It is not created by "speculation, conjecture, imagination or guess work." [Citation.] Further, an issue of fact is not raised by "cryptic, broadly phrased, and conclusory assertions" [citation], or mere possibilities [citation]. "Thus, while the court in determining a motion for summary judgment does not 'try' the case, the court is bound to consider the competency of the evidence presented." ' " (*Brown, supra*, 171 Cal.App.4th at pp. 525–526.)

"On appeal, the reviewing court makes ' "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law. [Citations.]" ' [Citations.] A trial court's ruling granting summary judgment may be affirmed on appeal if it is proper upon any theory of law applicable to the case." (*Brown, supra*, 171 Cal.App.4th at p. 526.)

" 'The rule that a trial court must liberally construe the evidence submitted in opposition to a summary judgment motion applies in ruling on both the admissibility of expert testimony and its sufficiency to create a triable issue of fact. [Citations.] In light of the rule of liberal construction, a reasoned explanation required in an expert declaration filed in opposition to a summary judgment motion need not be as detailed or extensive as that required in expert testimony presented in support of a summary judgment motion or at trial.' " (*A.B. v. County of San Diego* (2025) 112 Cal.App.5th 404, 420 (*San Diego*).) A court of appeal reviews a trial court's rulings on

evidentiary objections in summary judgment proceedings for abuse of discretion. (*San Francisco Print Media Co. v. The Hearst Corp.* (2020) 44 Cal.App.5th 952, 962.)

## II

### *Legal Standards*

"Except when otherwise provided by law, public employees in California are statutorily liable to the same extent as private persons for injuries caused by their acts or omissions, subject to the same defenses available to private persons. (Gov. Code, § 820.) Also, public entities are generally liable for injuries caused by the negligence of their employees acting in the scope of their employment. (*Id*., § 815.2.) Finally, close relatives and dependents of a negligently killed person can recover damages for their loss. (Code Civ. Proc., § 377.60.) Under those state statutes, general principles of tort law, in particular the law of negligence, govern this case." (*Hayes v. County of San Diego* (2013) 57 Cal.4th 622, 628–629 (*Hayes*).)

" '[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury.' (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 292; see *Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1250.) Thus, duty is a critical element of negligence liability." (*Hayes, supra*, 57 Cal.4th at p. 629.) "Th[e] [Supreme] [C]ourt has long recognized that peace officers have a duty to act reasonably when using deadly force. (*Munoz v. Olin* (1979) 24 Cal.3d 629, 634; *Grudt v. City of Los Angeles* (1970) 2 Cal.3d 575, 587 (*Grudt*).) The reasonableness of an officer's conduct is determined in light of the totality of circumstances." (*Hayes, supra*, 57 Cal.4th at p. 629.)

9

In determining the reasonableness of a police shooting, "preshooting conduct is included in the totality of circumstances surrounding an officer's use of deadly force, and therefore the officer's duty to act reasonably when using deadly force extends to preshooting conduct. (*Grudt*, [*supra*, 2 Cal.3d] at pp. 585–588.) But in a case like this one, where the preshooting conduct did not cause the plaintiff[s] any injury independent of the injury resulting from the shooting, the reasonableness of the officers' preshooting conduct should not be considered in isolation. Rather, it should be considered in relation to the question whether the officers' ultimate use of deadly force was reasonable."[3] (*Hayes, supra*, 57 Cal.4th at p. 632.)

_____

[3] The CHP asserts the appellants' "preshooting theory is based on the wrong legal standard" and that they improperly apply "the more-stringent standard for the use of deadly force in imminent self-defense … to the *non-deadly preshooting conduct* that appellants challenge …." The CHP also states, "where the officer's pre-shooting conduct is independently authorized under the statutory standard for reasonable force to arrest …, with its associated protection against any subsequent obligation to retreat …, this proper pre-shooting conduct cannot undermine the justification for an otherwise reasonable shooting." We do not agree with the CHP's characterization of the appellants' argument. Appellants concede only that in isolation Farner's shooting was justified and they do not argue that liability attaches only to the pre-shooting conduct. The appellants contend that under the applicable standard, which the parties agree requires the factfinder to examine the totality of the circumstances surrounding the shooting, the CHP has not established as a matter of law that Farner's conduct was reasonable. As the Supreme Court explained in *Hayes*, where, as here, the plaintiffs have not alleged "a separate injury from the preshooting conduct of law enforcement personnel, the preshooting conduct is only relevant … to the extent it shows, as part of the totality of the circumstances, that the shooting itself was negligent" and not as an independent basis of liability. (*Hayes, supra*, 57 Cal.4th at p. 631.)

10

Importantly, " '[t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' (*Graham v. Connor* (1989) 490 U.S. 386, 396.) In addition, '[a]s long as an officer's conduct falls within the range of conduct that is reasonable under the circumstances, there is no requirement that he or she choose the "most reasonable" action or the conduct that is the least likely to cause harm and at the same time the most likely to result in the successful apprehension of a violent suspect, in order to avoid liability for negligence.' (*Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 537–538.) Although preshooting conduct is included in the totality of circumstances, we do not want to suggest that a particular preshooting protocol (such as a background check or consultation with psychiatric experts) is always required. Law enforcement personnel have a degree of discretion as to how they choose to address a particular situation." (*Hayes, supra*, 57 Cal.4th at p. 632.)

" ' "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. [Citations.]" ' [Citations.] In calculating whether the amount of force was excessive, a trier of fact must recognize that peace officers are often forced to make split-second judgments, in tense circumstances, concerning the amount of force required. [Citation.] [¶] ' "We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure." [Citations.]' Placing the burden of proof on the plaintiff to establish that an officer's use of force was unreasonable 'gives the police appropriate

11

maneuvering room in which to make such judgments free from the need to justify every action in a court of law.'" (*Brown, supra*, 171 Cal.App.4th at pp. 527–528.)

### III

### *Analysis*

The trial court found the plaintiffs failed to demonstrate "how any plan of action would have changed the outcome, i.e., the need to shoot [McMurtry] who was charging at Sargeant Farner with a knife" or "that Farner having his weapon out upon arriving and yelling at [McMurtry] led to [McMurtry] approaching Farner's patrol vehicle and pointing the knife at him." The court also concluded that "[t]he facts speak of a mentally ill person who was seeking to die so he headed toward a CHP patrol vehicle, held up his knife, and ran toward an officer who was holding a gun" and "other officers were in the general area … were not close enough to dispel their non-lethal weapons to prevent [McMurtry] from charging with a knife" at Farner. Based on these findings, the court decided "the shooting was justified" and "no jury could reasonably find the use of force was unreasonable based on the totality of the circumstances."

The appellants assert this ruling was in error because triable issues of fact remain concerning whether Farner's conduct, specifically responding to the call by immediately exiting his car and aiming his gun at McMurtry, was reasonable; whether Farner's conduct provoked McMurtry into charging him or McMurtry intended "suicide by cop" as the trial court found; and whether Farner's decision to act alone without formulating a plan with his fellow officers was reasonable. We agree with the appellants that material questions of fact remain as to whether Farner acted reasonably in this situation. The trial court erred by concluding that because the plaintiffs did

12

not show "how any plan of action would have changed the outcome" or how Farner's acts of "having his weapon out … and yelling at [McMurtry] led to" the shooting, the shooting was justified as a matter of law.

The standard employed by the trial court was not the proper one. It focused too narrowly on the seconds before McMurtry was shot, rather than the totality of the circumstances. (*Hayes, supra*, 57 Cal.4th at p. 632.) The plaintiffs were required to show, and did show, that a dispute remained as to whether Farner acted reasonably when he failed to communicate with the other responding police officers before attempting to apprehend McMurtry, and by immediately exiting his car and pointing his weapon at McMurtry, who Farner knew was in the midst of a severe mental health crisis.

The portions of Clark's declaration that were not subject to sustained evidentiary objections and the deposition testimony of Migliacci, Garcia, and Goodly submitted in support of the plaintiffs' opposition were sufficient to dispute the CHP's assertion that Farner acted reasonably as a matter of law. This evidence showed Farner's fellow CHP officers believed there was sufficient time to employ non-lethal force; that Farner was trained to deal with situations like this by using and communicating with backup officers and formulating a plan with available resources before acting; and that a witness in a nearby vehicle did not view McMurtry as a threat. This evidence showed material questions remained about the reasonableness of Farner's conduct.

In response to the appellants' arguments, the CHP asserts that Clark's expert declaration failed to rebut its showing that Farner acted reasonably. It argues there was no dispute "that there were civilians near [McMurtry], because freeway traffic came to a stop directly behind him, and the video of the shooting even shows [McMurtry] walking past an occupied SUV with its

window open." But there was evidence before the trial court that disputed these facts. Goodly, who witnessed the shooting, testified in her deposition that McMurtry was calm before Farner arrived and was walking in the center divider of the freeway. The dispatch reported McMurtry had tried to open car doors, but no other evidence showed McMurtry threatened other bystanders.[4]

The CHP also argues that "Clark's analysis of 'lethal' force at the beginning of the encounter further lacks support because Sgt. Farner did not use lethal force until [McMurtry] had charged at him with a knife for the second time, at which point appellants do not dispute the propriety of the shooting." However, even without relying on Clark's opinion that less lethal force was appropriate at the beginning of Farner's encounter with McMurtry, both Migliacci and Garcia testified they believed there was time and opportunity for the use of non-lethal force in the situation.

Migliacci stated he had his taser in his hand and that "in [his] mind, [he] wanted to use less-than-lethal force over lethal force" when he arrived on the scene. Garcia stated that as he arrived at the scene he reported over his radio that he had "less lethal" force in his vehicle and that he assumed there

---

[4]     The CHP asserts Goodly's testimony cannot establish a material dispute because there is no significance to the fact that she saw officers on the opposite side of the freeway and Galvez's "video … conclusively shows that there was no group of officers and cars in front of [McMurtry] on his side of the freeway." As an initial matter, the video contains less than one second of footage of the westbound side of the freeway and no clear image of what was occurring there. In addition, the significance of Goodly's testimony is not only what she observed on the westbound side of the interstate, but what she witnessed of McMurtry's behavior and the scene at the time of the shooting, including the fact that she did not perceive any threat to her safety.

14

was time to deploy it. He also stated that based on the information he had as he drove to the scene, he believed "bringing the beanbag shotgun [that was in his car] was an appropriate use of force." This evidence contradicts the CHP's assertion that there was no dispute about the need for lethal force.[5] Further, as set forth previously, the factfinder must look at the totality of the circumstances surrounding the shooting to determine if it was reasonable, not just the few seconds preceding the shooting. (See *Hayes, supra*, 57 Cal.4th at p. 632; *Gold v. California Highway Patrol* (N.D.Cal. 2025) 763 F.Supp.3d 914, 931 [Under California negligence law, "[c]ourts analyze the reasonableness of the officer's conduct using the totality of the circumstances and from the perspective of a reasonable officer on the scene."].)[6] For this reason, even if the shooting was justified in isolation, the trial court was required to consider the totality of the circumstances in deciding whether triable issues of material fact remained.

The CHP also argues there is no factual foundation for Clark's opinion that McMurtry charged at Farner because he was fearful. On this issue, we agree with the CHP and the trial court that this opinion was based only on speculation and that no facts in the record supported Clark's conclusion that

_____

[5] The CHP asserts the officers' testimony is mere speculation, insufficient to create a triable issue of material fact and it also argues the officers' statements do not constitute admissible expert opinions. These arguments are not well-taken. Migliacci and Garcia were participants in the search for McMurtry, aware of the same circumstances as Farner, and their observations about the situation and their own conduct constitutes percipient witness evidence; not speculation or improper expert opinion testimony.

[6] Although not binding authority, because Fourth Amendment rights are often litigated in federal court alongside state negligence cases, federal cases have illuminated our state standards.

McMurtry was fearful of Farner. However, whether McMurtry feared Farner before he ran towards him with the knife does not establish that Farner acted reasonably, as a matter of law, in the time between when McMurtry was located and when Farner shot him. Rather, this disputed issue is properly determined by the fact finder at trial.

The CHP's additional arguments similarly do not show Farner's conduct was reasonable as a matter of law. It asserts that "there is no factual foundation for Clark's criticism that Sgt. Farner failed to 'let non-lethal act first,' to 'retreat[] and place[] distance between himself and' [McMurtry], or to 'place himself in a position of cover.' " The CHP asserts that instead, the undisputed facts show Farner did retreat and create distance between himself and McMurtry and used the non-lethal force of "merely pointing his gun" at McMurtry. This framing of the interaction, however, is too narrow. As discussed, the finder of fact must consider the totality of the circumstances that led to the death, not merely the few seconds that preceded the shooting. The facts in the record could support a finding that Farner acted unreasonably by immediately getting out of his police vehicle and pointing his gun at McMurtry, rather than communicating with his fellow law enforcement officers to determine how to approach McMurtry and take him into custody.

The CHP also complains that Clark did not sufficiently explain the terms " 'lethal cover, non-lethal, ingress, threshold for lethal force, and tactical positioning.' " This argument also lacks merit. The meanings of these terms are self-evident and defined in Clark's declaration. Further, Clark's declaration makes clear that his opinion is that it was unreasonable for Farner to act alone in the manner that he did, without devising any plan with other first responders. The declaration also contains explanation of the

16

training Farner received and how his actions were contrary to that instruction. The CHP did not object to these portions of the declaration, and Clark's statements raise material questions of fact concerning the reasonableness of Farner's course of action. (See *San Diego, supra*, 112 Cal.App.5th at p. 423 ["Because the reasonableness of a particular use of force is judged from the perspective of a 'reasonable officer' on the scene, department policies, prevailing standards, and training protocols addressing how a reasonable officer should act in similar circumstances are often relevant to determining whether force was excessive."].)

Similarly, the CHP complains there is no evidence concerning the availability of a mental health response team that would support a finding that Farner acted unreasonably by failing to contact this resource. As the CHP points out, there is no evidence that the team was available at the time of the emergency. However, as discussed, to determine whether liability exists the factfinder must consider the totality of circumstances surrounding the police shooting, not any particular fact in isolation. Whether the mental health response team was available to respond is an issue of fact to be developed at trial and does not support the trial court's determination at this stage that Farner's conduct was reasonable as a matter of law.

We are well aware of the stress and difficulties faced by law enforcement responding to dangerous situations like the one presented here, and do not take the decision to reverse summary judgment lightly. However, on these facts, the CHP did not establish as a matter of law that Farner acted reasonably. Rather, it is appropriate for the jury to consider the totality of the circumstances surrounding the shooting to make this determination. (See *Chew v. Gates* (9th Cir. 1994) 27 F.3d 1432, 1440 ["Because questions of

17

reasonableness are not well-suited to precise legal determination, the propriety of a particular use of force is generally an issue for the jury."].)

IV

*Evidentiary Objections to Clark's Declaration*

The appellants assert the trial court abused its discretion by sustaining several objections to Clark's declaration. They argue the court failed to liberally construe the declaration and the CHP's objections were "no more than [its] disagreement[s] with Mr. Clark's conclusions" and did not demonstrate the opinions lacked reasoned explanation. The CHP responds only that the court did not abuse its discretion, and because Clark's work was criticized by this court in *Brown, supra*, 171 Cal.App.4th 516, it was properly excluded by the trial court.

We agree with appellants that the court abused its discretion by excluding portions of Clark's declaration. As the appellants point out, the CHP did not make specific objections to the statements in Clark's declaration, but instead asserted only that he did not provide a sufficient "reasoned explanation" for his statements and opinions. As an initial matter, "we cannot disregard expert testimony on summary judgment merely because courts in other unrelated cases may have criticized or rejected the expert's opinions on different facts and issues. The defendants do not challenge Clark's qualifications as a use-of-force expert, and Clark's report lists scores of cases in which his opinions have been [considered] on such issues. We must evaluate Clark's opinions based on the facts and circumstances of this case, not other cases." (*San Diego, supra*, 112 Cal.App.5th at p. 420.)

Further, the CHP's conclusory assertion that Clark failed to provide "a reasoned explanation" for his assertions that Farner did not act in accordance with his training "is not a basis to disregard Clark's opinions." (*San Diego,*

18

*supra*, 112 Cal.App.5th at p. 420.) Rather, " '[t]he rule that a trial court must liberally construe the evidence submitted in opposition to a summary judgment motion applies in ruling on both the admissibility of expert testimony and its sufficiency to create a triable issue of fact. [Citations.] In light of the rule of liberal construction, a reasoned explanation required in an expert declaration filed in opposition to a summary judgment motion need not be as detailed or extensive as that required in expert testimony presented in support of a summary judgment motion or at trial.' " (*Id*. at pp. 419–420.) We agree with the appellants that Clark provided sufficient explanation of the opinions and facts he used to support his opinions.

Of note, the CHP objected to Clark's statements that "[w]hen Sergeant Farner arrived, he placed himself in a position where he was exposed and without proper non-lethal options. Sergeant Farner did not wait until the officers were situated and/or did not wait for the other officers to take cover and place themselves in a position of safety." These statements, however, were supported by other evidence submitted in opposition to the summary judgment motion, including Farner's own declaration and testimony, and the testimony of Migliacci and Garcia. Thus, sustaining the CHP's objections to these statements for lack of foundation was an abuse of discretion.

The CHP also objected to Clark's statement, "Sergeant Farner [had] arrived on scene only seconds before he discharged his firearm, and decided to use lethal force against Mr. McMurtry, even though there were no civilians immediately near Mr. McMurtry, and officers had time and room to tactically reposition." Again, there were facts in the record to support this assertion. Farner himself stated that he drew his weapon as soon as he exited his car and Goodly testified that Farner fired the weapon within a minute of her noticing Farner. Goodly also testified that McMurtry was calm before Farner

19

encountered him, and that McMurtry was walking slowly in the center divider away from traffic, which had come to a stop. And Migliacci and Garcia were close behind Farner with non-lethal weapons. Accordingly, Clark's statement was supported by facts in the record and the court's decision to sustain the CHP's objection based on lack of foundation was an abuse of discretion.

The court also sustained the CHP's objection based on lack of foundation to Clark's statement that the responding "officers did not coordinate and no officer took on a lead role in organizing and planning the tactics. No one seeks counsel over the radio. None of the officers suggest waiting at a staging area. The officers ignored basic tactical principles such as establishing cover." Again, facts in the record supported these statements. Farner himself stated in his deposition that he immediately exited his vehicle with his gun drawn when he arrived at the scene and did not communicate or coordinate with other responders. Accordingly, the CHP's objection should have been overruled.

As stated above, Clark also set forth an explanation of the training the CHP officers were provided concerning the use of lethal force and opined that Farner's conduct did not conform to this training. These opinion statements were supported by reasoned explanations and by Clark's experience and educational background, to which the CHP did not object. The trial court's exclusion of the evidence for lack of foundation was improper. (See *Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 189 ["The rule that a trial court must liberally construe the evidence submitted in opposition to a summary judgment motion applies in ruling on both the admissibility of expert testimony and its sufficiency to create a triable issue of fact."].)

DISPOSITION

The judgment is reversed, and the matter is remanded with directions that the trial court vacate its order granting the CHP's motion for summary judgment and issue a new order denying the motion.  The costs of appeal are awarded to Appellants.

McCONNELL, P. J.

WE CONCUR:

BUCHANAN, J.

RUBIN, J.

21